## Borderland Coal Company v. Miller, By et al.

(Decided March 12, 1918.)

### Appeal from Pike Circuit Court.

Trial—Master and Servant—Instructions—Duty of Jury to Consider Together All That Are Given.—When there is a series of instructions presenting different theories of the case, it is the duty of the jury to consider all of them together.

J. J. MOORE, JAMES P. WOODS and SAMUEL D. STOKES for appellant.

A. J. KIRK and CLINE & STEELE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

For some six months prior to June 15, 1915, the appellee, Miller, was employed by the appellant coal company as a brakeman on one of its motor cars in its mine. The electric wire which carried the current to operate the motors was suspended from the roof of the mine, and the trolley poles that connected the current with the motors were attached to the motors very much in the same way that trolley poles are attached to street cars operated by electricity. One of the duties of Miller, who was between eighteen and nineteen years old, was to look after the trolley pole and to see that it was kept in place and in contact with the electric wire.

On the occasion of the injury complained of the motor was going into the mine, and in order to permit a motor coming out with a load of coal cars to pass, the motor on which Miller was brakeman and a man named Marcum, the motorman, took a side track. After the train had passed, Marcum, the motorman, said to Miller, "Come on; let's go," meaning that they would go off the siding they had taken and get on the main track. To do this it was necessary to back the motor from the place on the siding at which it had stopped a short distance from the main track. In running the motor it was usual to let the trolley pole trail behind, and when the motor went in on the siding the trolley pole was at the rear end of it, but when the motor started back out of the siding the trolley pole was not changed to the rear end of the car but was permitted to remain in the same position that it was when the car went in on the siding.

The result of this was that the trolley pole was ahead of the car as it went off the siding, and when the wheel on the end of the trolley pole that ran on the electric wire came in contact with the frog in the wires at the junction of the side track wire with the main track wire, the trolley pole jumped from the wire, and hitting against the roof of the mine, which was only a few feet above the motor, the pole broke into three pieces, and in some way not very clearly explained, or, at any rate, difficult to put down in writing, the hand of appellee came in contact with the electric wire and the end of one of his index fingers was burned so badly that it had to be amputated at the base of the nail, and he was otherwise so severely shocked by the electricity as to be unconscious for a short while.

Aside from the physical suffering he sustained and the loss of the end of his finger, he was incapable of work-

ing for some forty or fifty days, and testified at the trial, more than a year afterwards, that he could not do as much work as he could before the accident, and that when he exerted himself his heart bothered him.

To recover damages for the injuries so sustained, he brought this suit, and on a trial there was a verdict and judgment in his favor for one thousand dollars.

In the instructions the court told the jury that if they believed from the evidence that the motorman, Marcum, who was in charge of the car when Miller was injured, so negligently handled and operated the car as to cause the trolley pole to run off the trolley wire and break and thereby cause the trolley wire to come in contact with Miller's finger or hand, whereby he was injured, and should further believe that the motorman knew, or by the exercise of ordinary care could have known, that to handle and operate the car with the trolley pole in front of the car as he did was liable to cause the trolley pole to leave the wire and break and injure Miller, they should find for Miller.

In another instruction given on request of counsel for the coal company, the jury were told that if they believed from the evidence that Miller knew, or in the exercise of ordinary care could have known, that the motor was being backed by Marcum with the trolley pole in front of it, and that the pole would be more likely to leave the wire and come in contact with the roof and break at a time when he had hold of the pole, they should find for the coal company.

On these issues Miller testified, in substance, that he had been working as a brakeman on this motor for about six months before the accident; that at the time of the accident he and Marcum, the motorman, went on the siding to let a train of coal cars go by, and when they passed, backed out to the main track for the purpose of proceeding on their journey in the mine; that when the motorman started the motor back, he, Miller, was on the front end of the motor, and the trolley pole, which was on the rear end of the motor when it went on the siding, was on the front end when it backed out; that the motorman started back so fast that the wheel on the motor pole could not follow the wire, and when it came to the fork at the junction of the siding wire with the main track wire, it jumped from the wire, and the end of it went against the roof, breaking the motor pole which he had hold of

in two or three pieces, and the wire came in contact with his hand.

He also said that the motorman had charge of the motor and that he as brakeman did what the motorman told him to do; that the motorman, when he started back, did not tell him to reverse the pole but simply told him to "Come on; let's go"; that he did not tell him before backing out to change the trolley pole; that when he started he put on full speed and was going at full speed when the wheel on the end of the trolley pole struck the fork in the wires and jumped from the wires, hitting the roof and breaking the pole; that the fork was only a few feet from where the motor started, and the motor should have been run at slow speed, and that if it had been so run the trolley pole would not have left the wire when it hit the frog or fork.

Marcum, the motorman, said that it was the duty of Miller as brakeman to attend to the trolley pole; that it was customary in the mine to run the motor with the trolley pole ahead of it for a short distance; that when they went on the siding the trolley pole was trailing behind the motor, and when they backed out of the siding and on to the main track, the trolley pole was in front; that he did not start the motor rapidly, and that when the trolley pole left the wire he was going about as fast as a man could walk; that Miller could have prevented the pole from leaving the wire if he had been looking after it carefully; that the motor pole was more liable to become disconnected from the wire when it was in front of the motor than when it was trailing behind, and more liable to break; that he ran the motor out to the main track with the trolley pole in front because all the motormen did that way; that Miller knew that when the train which they had taken the siding to let go by had passed, they would go out on the main track, and that it was the duty of Miller as brakeman to turn the pole when necessary, which it was very little trouble to do, but that he did not do it on this occasion.

Dr. Turner, the only physician who testified in the case, said that he amputated the end of Miller's finger and dressed it a few times afterward; that the shock Miller received would not cause any permanent injury; that it took his finger ten days or two weeks to heal.

The grounds for reversal relied on are: The failure of the court to order as requested a directed verdict for

the coal company; that the verdict is in conflict with instructions given by the court, and that the verdict is excessive.

On the evidence it seems very plain that it was the duty of Miller to attend to the trolley pole and change it from one end of the motor to the other when necessary; that he knew that the motor went in on the siding to let the other train of coal cars go by, and that when it had passed the motor would be run back on the main track; that he knew that the trolley pole was trailing behind the motor as it went in on the siding and knew that it was in front of the motor as it was being backed out, and also knew that it was the proper way to have the trolley pole trailing behind instead of being pushed in front of the motor. It is also undisputed in the evidence that the motorman did not direct Miller to change the trolley pole, because it was the custom when the motor was only going a short distance to let the trolley pole remain in front of the motor. On this occasion the trolley pole was only in front of the motor until it got on the main track, which was only a few feet from the place from which it started on the siding, and when it had gotten on the main track and proceeded on its journey into the mine, the trolley pole would have trailed behind the motor, as it did before the motor was run in on the siding.

It will thus be seen that there is evidence that the accident was caused by the rapid and negligent manner in which the motor was started and run out of the siding, and on this issue, which was properly submitted in the instruction referred to, the jury doubtless found that the accident and injury were brought about by the negligent manner in which the motor was operated by Marcum, and of course Miller was not at all responsible for this negligence.

It is true that it would have been safer to have changed the trolley pole just before the motor backed out to the main track, and very probable that if the trolley pole had been so changed the accident would not have happened, but in view of the custom to let the trolley pole remain in front when the motor was going to be run only a few feet, it cannot be said as a matter of law that Miller was guilty of contributory negligence in failing to change the trolley pole, and so the motion for a directed verdict was properly overruled.

It is insisted, however, that the jury disregarded the instruction given by. the court at the instance of counsel for the coal company and heretofore mentioned. In this instruction the court, as we have said, told the jury that if they believed Miller knew the car was being backed with the trolley pole in front of it, and knew that on account of this the trolley pole would be more likely to come in contact with the roof of the mine, they should find for the coal company; and considered by itself this instruction probably was, as contended by counsel for the coal company, a peremptory direction under the evidence to find for the coal company.

This instruction did not present correctly the law of the case, because it should have been qualified or extended so as to direct the attention of the jury to the fact that, notwithstanding this knowledge on the part of Miller, if the accident was caused by the rapid and negligent manner in which the motor was operated, the fact that Miller knew the motor was being backed with the trolley pole in front and that the trolley pole would be more likely on this account to leave the wire and come in contact with the roof, would not bar his right of recovery.

It is also true that although instructions may be erroneous, the jury are bound by them, and that a verdict found contrary to instructions, although erroneous, will be set aside, because erroneous instructions, so far as the jury is concerned, are as much the law as correct instructions would be.

But when there are a series of instructions, as there were here, presenting different theories of the case, it is the duty of the jury to consider all of the instructions together. They are no more bound by what is said in one than they are by what is said in another; and when so read and considered, the instruction in question did not have the peremptory effect claimed for it by counsel.

The assessment of damages appears to us to have been larger than it should have, but we cannot say that it was so excessive as to appear at first blush to have been the result of passion or prejudice. The loss of the end of the finger was not the only injury that Miller sustained. He was very severely shocked by the electric current, and it is difficult if not impossible to estimate the seriousness of an electric shock, although there may be an apparent recovery from it in a short while. In this case, however, Miller testified that more than a year aft-

erwards he was suffering from the effects of this shock and incapacitated by reason thereof from performing the full amount of work that he was accustomed to doing before receiving it.

Wherefore, the judgment is affirmed.