## Louisville & N. R. Co. v. Moore's Adm'r.

May 29, 1942.

H. T. Lively, C. E. Rice, Jr., and Rodes & Willock for appellant.

Caldwell & Gray, August Winkenhofer and Rodes K. Myers for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

This appeal is from a judgment for $18,000 in favor of appellee for damages for the wrongful death of his decedent, Archer Moore, a resident of Ashland, who was shot and killed in Bowling Green, near appellant's railroad yards, by M. P. Raney, a special policeman employed by the appellant pursuant to Kentucky Statutes, Section 779a-3. The judgment was against Raney as well as appellant, but there is no appeal by Raney.

The first contention is that error was committed in overruling appellant's plea to the jurisdiction of the court. Section 73 of the Civil Code of Practice, in localizing jurisdiction of actions against common carriers for injury to a person, provides in part that the action may be brought in the county "in which the plaintiff or his property is injured." While the plaintiff in this action is a personal representative, qualified in Boyd County (necessarily, the injured person could not be the plaintiff since he was killed), nevertheless it is in effect, the estate of the injured person which is the plaintiff in the action, and the acts resulting in his death were committed in Warren County. In these circumstances the construction we have placed on the quoted language of Section 73 of the Civil Code of Practice clearly gives jurisdiction in an action of this character to the county in which a decedent was killed. In Melton's Adm'r v. Southern Railway Co., 236 Ky. 629, 33 S. W. (2d) 690, 693, in construing the quoted language, we said:

"The provision of Section 73 of the Code that venue lies in the county where the plaintiff or his property

is injured means that county where the facts occur out of which plaintiff's cause of action arises.''

In the instant case the facts out of which the plaintiff's cause of action arose occurred in Warren County and jurisdiction is therefore in the circuit court of that county.

The two main grounds urged for reversal are that the trial court erred in refusing to direct a verdict for appellant and also in overruling appellant's general demurrer to the petition. The argument that the petition failed to state a cause of action is to a large extent involved in the contention that a verdict should have been directed for appellant and for this reason the two grounds will be considered together. A statement of the substance of the evidence is necessary to a proper consideration of both grounds.

On the night in controversy one of appellant's inspectors had seen a freight car with an open door come into the yards on one of the trains. He reported this fact to appellant's yardmaster. The yardmaster in turn reported to Raney that there was a car in the yards with the door open or seal broken but did not tell him that the car had come into the yards in that manner. From later developments, it is apparent that Raney believed that someone had broken into the car in the yards. Acting on this information, Raney, with his wife, drove in his car to Adams Street in Bowling Green immediately adjacent to appellant's yards and left his car, his wife remaining in it, on Adams Street, while he went across the yards to investigate what he believed was a break in of the freight car.

Appellant's yards in Bowling Green lie north of and adjacent to Adams Street and west of and adjacent to Sixth Street and there is an underpass on the latter street. Beginning at a point on Sixth Street somewhat north of the underpass, a roadway runs from Sixth Street through appellant's yards in a westerly direction, this roadway being used to some extent by the general public. When Raney left his car and went across the appellant's yards he found the freight car with seal broken and entered it to ascertain whether anything had been stolen. He found no packages broken but had no way of knowing whether anything had been stolen from the car without checking the records. He placed a seal on the car and while going back across the yards toward his car

met another employee of appellant and was standing talking with him when he heard three men cursing and talking in the above mentioned roadway on appellant's property. Raney shined his flashlight in the direction of the men and hollered at them, whereupon they ran eastwardly on the roadway to Sixth Street and got in an automobile with only one headlight burning and drove south on Sixth Street in the direction of its intersection with Adams Street. Raney did not pursue them as they had too much of a start, but started across the yards in the direction of his car. On arriving at the south edge of the yards adjacent to Adams Street he heard voices on Adams Street. There is a high concrete retaining wall which forms the southern boundary of appellant's yards and Raney was at that time in the yards near the top of this retaining wall. Looking down into Adams Street, Raney saw that there were several men in a parked car with one headlight. He believed these men were the ones who had run out of appellant's yards and was suspicious that they had probably had something to do with breaking into the freight car.

Here began Raney's first contact with the decedent. In the car, which was parked on Adams Street in front of a negro house, were the decedent and three other boys and two girls who were students in one of the Bowling Green schools. They had been out together a good part of the afternoon and night and during the time they were together the crowd, and others with whom they had come in contact, had consumed about a pint of alcohol and a pint of whiskey, although the girls deny that they were drinking. In short, the party had been out having a big afternoon and night. Raney says that they were trying to compel the girls to go into the negro house, testimony which appears to be true but which is denied by the girls and boys. Raney shined his flashlight at them and asked them what they were doing. After some argument they moved off and Raney called to them to stop. When they did not do so, Raney ran in the yards toward his car and fired two shots with his pistol. He got in his car and pursued the car in which the decedent was riding for approximately three blocks, where he caught up with it and forced it to stop.

From this point on there is serious conflict in the evidence but the testimony of Raney and the occupants of the car makes it clear that Raney placed the occupants

under arrest. He notified them to follow him to the police station. As to what the arrest was for is much debated in the briefs, that is, whether it was because of the boys' attempt to get the girls to go into the negro house or whether it was on account of Raney's suspicion that the boys had something to do with the break in of the freight car. A close examination of Raney's testimony, however, convinces us that a primary purpose behind the arrest was to enable Raney to investigate fully into the car break. He stated that when the occupants of the car asked him what he was arresting them for he told them he was an officer and was down there investigating a car break in. He also told them that in addition thereto they were trying to get the girls to go into that negro house. Apparently, he believed that he had the right to arrest the boys for this latter offense. But we conclude that uppermost in Raney's mind was the purpose of ascertaining whether these boys had anything to do with the car break in.

Considerable talk and violent argument took place between Raney and the boys, who had gotten out of the car and left the girls in it. This argument took place some few feet from the car. During the course of the argument the girls called Raney to the car and told him they were all students and would be much embarrassed if they were arrested. Raney and one of the girls testified that upon learning this fact Raney told the girls that he did not know they were students when he arrested them and that they could go on provided they would get the boys to take them to their rooms. Apparently the boys did not hear this conversation, since they were standing some feet away from the car at the time.

At the conclusion of his talk with the girls, Raney started toward the back of the car, proceeding in the direction of his car. As to what happened then, the evidence becomes violently conflicting. While Raney was talking to the girls the decedent made the proposition that if the others would chip in and help pay his fine he would whip Raney. About the time Raney reached the back end of the car in which the girls were sitting the fight occurred. The numerical weight of the evidence is that while Raney was talking and arguing with the boys he hit the decedent with his blackjack and that thereupon one of the other boys grabbed him and the decedent took the blackjack. Raney's version is that the boys jumped

on him and that the decedent took his blackjack and was beating him over the head with it, whereupon he drew his pistol and fired one time in self-defense. This shot struck the decedent and resulted in his death a few hours later. Two of the boys who were with the decedent testified that when Raney reached the back end of the car in which the girls were sitting he was still saying that he would take off his badge and whip them all one at a time and that while this argument was going on he struck the decedent with something shiney, this while the decedent was walking away from him, and that when the decedent turned Raney drew his pistol and fired. In this testimony the boys are corroborated by outsiders who had come upon the scene of action. Thus, while Raney had apparently released the girls from arrest, no communication of this fact had been made to the decedent or the other boys and they had not been notified that they were released from the arrest at the time the fight occurred.

By instruction No. 2 the court told the jury that at the time in controversy Raney was a railroad policeman and an employee of the appellant and if they believed that Raney, while acting in the scope of his employment, believed that certain persons had committed or were about to commit a public offense on or about the railroad property and attempted to stop such persons and pursued the automobile which he believed contained such persons and in attempting to arrest them shot and killed the decedent, the jury should find for the plaintiff unless they believed that Raney at the time of the shooting acted in self-defense.

By the third instruction the jury were told that if they believed the occupants of the automobile had not molested any property of appellant, had not threatened to do so, and said and did nothing from which it could reasonably be inferred that they had molested its property or intended to do so, then in pursuing the automobile or in participating in an altercation resulting in the death of decedent, Raney acted without authority of appellant and outside of the scope of his employment as a railroad policeman and appellant was not liable.

Appellant is most insistent that the petition failed to state a cause of action because of failure to allege grounds for a legal arrest, that is, either that Raney had

a warrant of arrest, or that an offense had been committed in his presence or that he had reasonable grounds for believing that the decedent had committed a felony. Many authorities are cited to the effect that a legal arrest may be made by an officer only in one of these three ways. It may be conceded that appellant is correct in this contention but nevertheless this is not determinative of the case.

It is our opinion that the case must be solved in the light of the law of principal and agent not under the principles of legality of arrest since, although Raney was an officer, he was also a servant and employee of appellant. Further, it is our opinion that the many cases written by this court dealing with the liability of a surety on an officer's official bond, including the leading case of Jones v. Van Bever, 164 Ky. 80, 174 S. W. 795, L. R. A. 1915E, 172, are not controlling of the case before us. Those cases hold that where an illegal arrest is made by an officer the surety on his bond is not liable since the officer is acting beyond the scope of his authority. Conceding that Raney had no justifiable grounds for arresting decedent and the other occupants of the car, it is nevertheless apparent that he believed he had such grounds and that he desired to accomplish the arrest, partly at least, for the purpose of determining whether they had anything to do with the break in of the freight car. This being true, he had in mind the interest of his employer and was acting in its interest when he made the arrest. In short, he believed that he had the right to make the arrest on suspicion as to the break in and, further, that he was justified in making the arrest because the boys were attempting to take the girls into the negro house. Without determining whether or not a railroad policeman may arrest for an ordinary misdemeanor committed on the streets of a city adjacent to railroad yards, we are nevertheless satisfied that Raney was making the arrest partly on account of his belief or suspicion that the occupants of the car had some connection with breaking into the freight car. This being true, he was acting as the agent and servant of the railroad company in making the arrest. This question was fully and carefully considered in Louisville & N. R. Co. v. Offutt, 204 Ky. 51, 56, 263 S. W. 665, 667, in which a special policeman, after making a legal arrest, illegally placed a boy in jail instead of taking him before a magistrate as required by law. The railroad company made

the contention there, as here, that the policeman's action was unjustified by law and that consequently he was acting beyond the scope of his authority and the company was not liable. The court there said:

"It is our opinion that since railroad companies only may select, pay, and discharge them, when they employ them they thereby invest their railroad policemen with the authority to determine for them when an arrest shall be made, who shall be arrested and what disposition shall be made of those arrested, and that for their illegal acts in making arrests and disposing of those arrested the railroad company is liable just as if it had directed them."

This we believe to be the sound rule. Pursuant to this rule, appellant invested Raney with authority to determine for it when an arrest should be made. Acting under this authority and in the interest of appellant, and believing that the decedent and those with him had some connection with the break in of the freight car, he made the arrest, partly, at least, for the purpose of determining whether or not the occupants had any connection with breaking into the freight car. In so doing he was acting for appellant, and appellant is liable for his action in connection therewith although the arrest was in fact illegal because he had not seen the commission of the offense and because of the absence of reasonable grounds to believe that a felony had been committed. We are therefore of the opinion that defendant's argument that the petition failed to state a cause of action is untenable.

Appellant's contention that a verdict should have been directed for it is divided into two component parts namely, (a) that Raney did not pursue the automobile because he had reasonable grounds for believing that its occupants had committed a felony on or about railroad property and (b) that when he pursued the automobile and assaulted and shot decedent, he had stepped aside from his employment as a railroad policeman and was not acting in furtherance of appellant's business. The conclusions enunciated in considering whether the petition stated a cause of action are determinative also of subdivision (a). Although the arrest may have been unjustifiable, nevertheless, as indicated above, the appellant, in employing Raney and having him designated

as policeman, invested him with authority to determine when an arrest should be made in connection with his belief that an offense had been committed with reference to its property. He did believe that the occupants of the car had probably committed such offense and was arresting them in connection with this belief. He was therefore acting as agent of appellant in making the arrest, within the terms of the declared rule.

In support of the theory outlined in subdivision (b), it is argued most earnestly by appellant that the evidence shows that such arrest as Raney made had been abandoned and that his action at the time the fight occurred in which the decedent was killed was purely a personal matter on Raney's part, he having at that time turned aside from and departed from the terms of any employment by appellant. If we considered only the testimony of Raney and one of the girls in the car, this contention might be well founded, but, as pointed out above, the decedent and the other boys apparently had no knowledge that Raney had abandoned his purpose of taking them to the police station and, as far as they knew, were still under arrest. Raney, having arrested the decedent under such circumstances as to render appellant liable for the illegal arrest, had not released him from the arrest thus made—at least the evidence justifies the finding of the jury to this effect, a finding necessarily involved in the verdict. The decedent being under arrest and, in legal effect, in Raney's custody, Raney, according to the weight of the evidence (at least the numerical weight), fired the shot which resulted in the decedent's death and in so doing did not, according to the finding of the jury, act in self-defense. This being true, we cannot escape the conclusion that appellant was responsible for his actions in so doing. Possibly appellant was entitled to an instruction on the question whether Raney had abandoned his intention of making the arrest and released the decedent at the time the fight occurred, but no such instruction was offered.

It is also insisted that instruction No. 2 was erroneous in that the jury were told, as a matter of law, that at the time in controversy Raney was a railroad policeman employed by appellant and as such possessed the power and authority to arrest for public offenses committed upon or about railroad property. It is argued that since the vital issue was whether Raney was acting

within the scope of his employment as a railroad police-man the instruction was erroneous, since under it Raney's official acts continued throughout the unauthorized pursuit of the automobile. We see no merit in this argument or prejudice to appellant by the complained of language. Raney was a special policeman at the time and did have the authority to arrest and in so doing had the authority to arrest anywhere in the county. Johnson v. Chesapeake & O. R. Co., 258 Ky. 789, 83 S. W. (2d) 521.

It is also argued that instructions Nos. 2 and 3 were hopelessly contradictory and irreconcilable and therefore prejudicial to appellant. This argument is based largely on the assumption that instruction No. 2 was erroneous in authorizing the finding for the plaintiff provided Raney, in making the arrest, was acting in accordance with his *belief* that the decedent and those with him in the car had molested the property of appellant. However, in view of our conclusion that this instruction correctly presented the law of the case, this argument has little strength. While instruction No. 3, standing alone, an erroneous instruction offered by appellant and unduly favorable to it, authorized a finding for appellant, nevertheless it was the duty of the jury to consider all the instructions together since there was a series of instructions, Borderland Coal Co. v. Miller, 179 Ky. 769, 201 S. W. 299, and the fact that the verdict was contrary to one instruction is not ground for a new trial where there are other instructions authorizing the verdict. Borderland Coal Co. v. Kirk, Adm'r, 180 Ky. 691, 203 S. W. 534. We think there was nothing prejudicial to appellant in the apparently contradictory nature of the two instructions.

The conclusions enunciated, which necessarily require an affirmance of the judgment, are reached without regard to the impression made on us by the evidence that Raney was doing what he believed to be his duty at the time of this unfortunate occurrence, and that the version of the affair as given by him is substantially correct, and that he was first assaulted by the deceased and his companions. However, there was ample substantial evidence to justify the jury in a contrary finding and, as is frequently the case, we are compelled to subordinate our views and uphold the verdict out of our respect and regard for the jury system. The jury may have concluded that Raney acted with bad judgment in pursuing the car

and that he used more force than necessary in resorting to his pistol, even though he was first assaulted. In abolishing the scintilla rule in Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, we referred to the great respect for the jury system evidenced by this court in its past decisions and indicated that we had no desire, in abolishing the rule, to invade the province of the jury. Since the rendition of that opinion, we have pointed out several times that it is all the more incumbent on us to refrain from encroaching on the province of the jury, since the consequences of holding a verdict flagrantly against the evidence, are more far reaching. In accord with this policy, and with some hesitation, we reach the conclusion that we would not be justified in holding the verdict to be flagrantly against the evidence.

Judgment affirmed.

Whole Court sitting.

Judges Thomas and Tilford dissent on the ground that they are of the opinion that the arrest had been abandoned by Raney and that at the time of the killing he was acting in his individual capacity and not as agent of appellant.