## Louisville & N. R. Co. et al. v. Vinson.

April 29, 1949.

Rehearing denied October 18, 1949.

H. T. Lively, J. P. Hamilton, J. L. Lenihan and James P. Helm, Jr. for appellants.

George B Ryan for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appellants seek the reversal of a judgment for $1,000 in favor of the appellee, Harold T. Vinson, as damages for false arrest.

The Louisville and Nashville Railroad Company leases ground adjacent to its Strawberry Yards south of Louisville to the L. & N. Golf Club. It is a corporate entity distinct from the railroad company. The significance of the name of the club is that its membership. consists largely of employees of the railroad company. It has some members who are not employees and is semi-public in that anyone paying greens fees may play on the course. Charles J. Lynn was the grounds keeper, and on Saturday afternoons and Sundays he personally operated a club house concession at which he sold golf equipment, soft drinks, etc. Some articles were stolen from him, and a few weeks later, on a Sunday morning, he found out that William Gatton, a former caddie, who was then playing on the grounds, had some of the stolen clubs in his possession. He asked him about them, and Gatton told him he had bought the clubs from a boy named Troxel and that Vinson knew he had them as he had asked his advice after he had discovered they had been stolen and he had advised him to return them to Lynn. Lynn then called Charles Simons, a police inspector of the railroad company, on the telephone and asked him to send a man out there. Simons asked George J. Weber, a member of his force, to go see what the trouble was. The company had no interest in the golf course, he testified, but thought there might be some trouble over in the railroad yards, which were next to the course. Lynn was quite friendly with Simons and Weber, and upon several occasions had advised Weber of the presence of suspicious characters on the company's yards and of some petty thefts of property which information had resulted in arrests. In reciprocation of those favors Weber had helped Lynn to investigate other break-ins

at the golf club house. When this theft occurred, Weber had gone over there from the railroad yards and obtained some fingerprints and talked to Lynn about it. Lynn testified he had called on the railroad officers because on previous occasions he had not been able to get any help from the county police, and Weber had helped him.

According to the plaintiff, Vinson, Lynn came out on the course and asked him to go over to his automobile in the parking lot. On the way Lynn asked him what he knew about some golf clubs that Gatton had. Weber and Gatton were in the car when they reached it. Lynn asked why he had not told him about knowing that Gatton had the clubs, and he replied that it had been told him in confidence. About that time Weber, who told Vinson he was an L. & N. detective, said, "Get into the car." Gatton told him that he had nothing to do with the matter, but Weber said he was in serious trouble and "he was going to send him up the river." Vinson was scared and regarded the statement "Get into the car" as an officer's command. He had no doubt that he was being put under arrest. Vinson and Gatton were taken to a watchman's shanty at the gate of the L. & N. shops, and the door was closed. All of this, Vinson testified, was against his will. Simons was called and they waited about an hour for him to come. After talking with Vinson, Simons said, "Release this man immediately. He had nothing to do with the case."

Gatton's account is substantially the same. He was told by Weber that he, Gatton, was in serious trouble and "might get from one to five years out of it." He had gone to his home with Lynn and Weber that morning and gotten some of the stolen equipment, which he gave them with a full account of having bought it from Troxel. He, too, had the idea that he was under arrest, but the parties were all more or less friendly and he was willing to get in the car and go with Weber and Lynn because he wanted to clear up the matter.

The testimony of Lynn and Weber is to the effect that the whole inquiry and incident were merely to develop the matter, and that neither Vinson nor Gatton were placed under arrest. Weber had no idea of doing that. Vinson and Gatton both went voluntarily to the watchman's shanty to wait for Simons. Weber had not

been interested in Vinson at all. He was interested in Gatton and in getting the stolen clubs back for his friend Lynn. Simons' testimony is that he had gone to the shops because Weber had called and asked him to come. Nobody accused Vinson, who merely stated Gatton had told him that he had bought the clubs from Troxel. There was nothing else said. He had not directed Vinson's release because he had no reason to do so, for he had no right to prefer charges against him and had not done so. They were not there over ten minutes altogether. Lynn took all the men back to the golf course and from there called the county police.

The court gave a peremptory instruction to find for the golf club. The jury exonerated Lynn and returned a verdict against the railroad company and Weber, jointly.

Vinson could reasonably have believed that he was under arrest, as he said. He insists that he was restrained against his will and deprived of his liberty. Here was a man clothed with power to arrest, though that power was limited by his special appointment as a railroad policeman to making arrests for public offenses having some relation to railroad property. KRS 277.-280; Louisville & N. R. Co. v. Offutt, 204 Ky. 51, 263 S. W. 665. Vinson could reasonably have yielded to what he then reasonably understood to be an officer's command to get into the car and go with him. We do not think Vinson was required to stop and inquire whether this was within the scope of his official authority. Accepting the plaintiff's version, we conclude there was sufficient evidence of an unlawful arrest, or what is more frequently and technically termed, "false imprisonment." Miller v. Ashcraft, 98 Ky. 314, 32 S. W. 1085; National Bond & Investment Co. v. Whithorn, 276 Ky. 204, 123 S. W. 2d 263; Ashland Dry Goods Co. v. Wages, 302 Ky. 577, 195 S. W. 2d 312.

Appellee's conception of liability of the railroad company is based upon the fact that the golf club premises are owned by the railroad company, that its officers are railroad employees, and that Weber and Simons were its police officers. The first two grounds are so untenable they may be passed without further notice. The third ground is not so free from doubt. The question is whether Weber was acting within the apparent

scope of his employment. Different terms have been used in our many opinions to define the conditions which will impose vicarious liability upon an employer for a wrongful act of his employee or as the servant of his master, to use the terms that have come down to us. It is frequently difficult to determine in a given case upon which side of the line the particular act belongs. We have recently stated that an important factor is whether the employee in committing the act was actuated, at least in part, by a purpose to serve, or believed he was serving the interest of his employer. Fournier v. Churchill Downs-Latonia, 292 Ky. 215, 166 S. W. 2d 38; Dennert v. Dee, 308 Ky. 687, 215 S. W. 2d 575. If a servant commits a wrongful act which is beyond the scope of his employment and not incident to or in execution or accomplishment of the service for which he is employed, he is deemed to have acted personally and to have stepped out of the relationship. Wood v. Southeastern Greyhound Lines, 302 Ky. 110, 194 S. W. 2d 81.

In the present case it may be agreed that Weber's interest in this matter arose in part out of the fact that he was a detective of experience and that he wished to reciprocate favors which his friend Lynn had shown him in his capacity as a police officer of the railroad company. But it is not sufficient to hold an employer liable merely because the wrongful act had its origin in some agency relation. Upon abundant authority it was written in J. J. Newberry Co. v. Judd, 259 Ky. 309, 82 S. W. 2d 359, 362, a case of false imprisonment, "the trend of the decisions is to exonerate the principal where the act was not for the protection of his property or interests, but was to vindicate public justice or to redress an offense against society, or to punish an offender for something already done, although the wrongful act had its origin in some agency relation." The circumstances do not afford the reasonable inference that it was done in furtherance of the master's business, or that there was an implied consent. Moore v. Ford Motor Co., 265 Ky. 575, 97 S. W. 2d 400. Here the railroad company was in no way concerned about the theft of golf equipment from the concessionaire of the club even though many of its employees were members of it. So it cannot be said that what Weber or Simons did on that Sunday afternoon was within the course of their employment. The situation is not like that for which the railroad company was

held liable in Louisville & N. R. Co. v. Moore's Adm'r, 292 Ky. 223, 166 S. W. 2d 68, where a railroad policeman shot and killed a man he had arrested near railroad property in the belief that an offense connected with the company's property had been committed although there were circumstances indicating that the arrest was illegal. No one claims in the instant case that such was the belief of the officer, or that he was actuated by a sense of duty to the railroad company. A man does not lose his character as an independent individual or his right to act as such or to use whatever talents or experience he may possess outside of his employment or agency. It may be said that Weber was on duty in the sense that he was subject to call at all times that any occasion may have demanded. But in this instance he stepped outside of his duty in going to answer the personal call of his friend through Simons. Wood v. Southeastern Greyhound Lines, supra, 302 Ky. 110, 194 S. W. 2d 81. This is clearer than where a servant assaults a person for some reason originating in some service of the master even if it was not. Moore v. Ford Motor Co., supra. There we held the assault to have been personal and the company not liable for it.

We are of opinion that the court should have given a peremptory instruction to find for the railroad company.

As to Weber, we think the given instructions were erroneous. The principal instruction predicated liability upon the belief by that jury that if Weber and Lynn, or either of them, had restrained or detained Vinson, and, further, if Simons had done so or helped to do so, they could find a verdict against Lynn, Weber, or the railroad company, or either of them who the jury believed was guilty. The instruction was calculated to confuse the jury and afford the belief they could find a verdict against Weber personally for whatever Simons might have done. Simons was not even sued and there was no issue in the pleadings as to his participation. The plaintiff himself stated that all Simons did was to order his release. In any event Weber could not be held responsible for what he did. And, though perhaps non-prejudicial, it was error to include the element of "force" since there had been no manifestation of force on the part of anyone. The greatest error is in the fact that the instruction did not conclude with the usual

converse statement, "Unless you so believe from the evidence, you will find for the defendants." The result was that there was no instruction given for the defendants. Golubic v. Rasnich, 249 Ky. 266, 60 S. W. 2d 616; City of Jackson v. Haddix, 280 Ky. 436, 133 S. W. 2d 547. In authorizing joint or separate verdicts against the three defendants the third instruction was so framed that the jury could not find against one defendant and in favor of the other two, which was an error.

The judgment is reversed and the case remanded for consistent proceedings.

Judge Cammack and Judge Latimer dissenting.