NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 10, et al., Respondents.

No. 16765.

United States Court of Appeals Ninth Circuit.

Oct. 13, 1960.

Rehearing Denied Dec. 19, 1960.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, A. Brummel, Attys., N.L.R.B., for the National Labor Relations Board.

Gladstein, Andersen, Leonard & Sibbett, Norman Leonard, San Francisco, Cal., for respondent Unions.

Richard Ernest, Richard M. Adams, San Francisco, Cal., for respondent, Pacific Maritime Association.

Before BONE, BARNES and JERTBERG, Circuit Judges.

BONE, Circuit Judge.

The National Labor Relations Board petitions us to enforce its order directing respondents to cease and desist from various unfair labor practices and to take certain affirmative action which in the Board's opinion will effectuate the purposes of the National Labor Relations Act. The Board's order resulted from charges brought by A. T. Satchell, a longshoreman. Satchell was the General Counsel's sole witness. The facts, gleaned for the most part from his testimony, are as follows:

In the spring of 1957, Satchell and others instituted a law suit to regain membership in respondent Local 10. From that time on, until January, 1958, when the present charges were heard before the Trial Examiner, Satchell was dispatched with regularity to longshore jobs on the San Francisco Bay waterfront.[1] On three occasions, however, he was prevented from working at the job to which he was dispatched. These occasions provide the grounds for the unfair labor practices charged against respondents.

On a date near or about July 27, 1957, Satchell was "dispatched" to Encinal Terminal, Alameda, for work. He was accompanied by another longshoreman named Meisner. Upon reaching this Terminal Satchell and Meisner separated, and Satchell encountered a steward of Local 10. The steward, addressing two other longshoremen who were present, said, "This fellow is suing the union. He can't work here. There's another one here too." Meisner approached the group at this time and one of the longshoremen took a swing at him. Meisner and Satchell both left the dock posthaste.

On August 24, 1957, Satchell was "dispatched" to a job at Pier 30 in San Francisco. The boss of the gang to which Satchell was dispatched ordered him to work in the hold of the vessel. A few minutes later, however, this gang boss recalled Satchell to the deck for a talk with Local 10's gang and dock steward. The latter individual was the instigator of Satchell's difficulties in July at the Encinal Terminal, and he again told Sat-

---

1. Satchell was dispatched for work during 1957, by the hiring hall operated by Local 2, International Longshoremen's and Warehousemen's Union, under the collective bargaining agreement which the International on behalf of itself and the locals affiliated with it had entered into with the Pacific Maritime Association. The exclusive hiring hall agreement is not challenged here. It did not bar non-union members or persons suing the union from being dispatched to jobs on the waterfront.

chell that he could not work on the waterfront. The gang boss, knowing that Satchell had a proper dispatch slip, sought some person of authority at the offices of Local 10, but no one could be found. The gang boss then told Satchell that if the men on the gang and the steward would agree to let Satchell work, he, the gang boss, would go along. The gang steward said he would go and consult with the gang. He subsequently returned and told the gang boss that the gang would not work with Satchell. The gang boss then stated that he could not hire Satchell. Satchell left.

On October 19, 1957, Satchell was dispatched to the Oakland Army Base. He found the gang to which he had been sent but unluckily met the gang steward, who said, "You're the one suing the union, aren't you?" The steward then found the gang boss and said to him, "You can't work this guy. He's suing the union." Satchell admitted to the gang boss that this was so. The gang boss replied that Satchell could not work. Upon leaving the dock, Satchell ran across another union steward who informed him that the "Stewards' Council" had ordered the stewards to discharge all of those individuals who were suing the union every time any one of them came to work.

The Trial Examiner in his Intermediate Report found that Local 10 was responsible for the behavior of its stewards, that the stewards restrained and coerced Satchell on a date near or about July 27, on August 24 and on October 19, in the exercise of rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, and that Local 10 had thereby thrice committed the unfair labor practice proscribed by § 8(b) (1) (A) of the Act, 29 U.S.C.A. § 158(b) (1) (A). Since no agent of Pacific Maritime Association (hereafter PMA) was present at the time of the July incident, the Trial Examiner concluded that no violation of § 8(b) (2), 29 U.S.C.A. § 158(b) (2), had then occurred. The pertinent sections of the National Labor Relations Act, as amended, are quoted in the margin.[2]

The Trial Examiner also found that the gang bosses involved in the incidents of August 24 and October 19 were the agents of PMA, that consequently PMA had on those two occasions violated §§ 8(a) (1) and 8(a) (3), 29 U.S.C.A. §§ 158(a) (1) and 158(a) (3), and that Local 10 through the agency of its stewards had caused PMA's violation and had thereby contravened § 8(b) (2). The Trial Examiner found that neither the stewards nor the gang bosses could be considered agents of the International Union. Accordingly, he held the International blameless.

The Board accepted the Trial Examiner's conclusions as to all the unfair labor practices which he ascribed to Local 10 and PMA. In addition, the Board found that the International as well as Local 10 had violated §§ 8(b) (1) (A) and 8(b) (2) on August 24 and October 19, first,

2. "§ 157. Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *."

"§ 158. Unfair labor practices

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * * *."

Sections 157 and 158 of the Code, above, are §§ 7 and 8 of the Act.

because the stewards of Local 10 were acting as agents of the International and second, because the gang bosses were acting not only on behalf of PMA, but also as agents for Local 10 and the International.[3]

### Substantial Evidence

Respondents deny that the record contains substantial evidence to support the Board's findings. They challenge in three particulars the sufficiency of Satchell's testimony: (1). Satchell first testified that the incident at Encinal Terminal had occurred on July 27, 1957, but he later recanted and said he wasn't sure of the exact date. It was shown to the Trial Examiner's satisfaction that no vessels were at the Terminal on July 27. (2). Satchell testified that the gang boss involved in the August 24 incident had told him that his name was Simon. Yet the gang boss who went by that name was shown not to have worked on August 24. (3). Satchell testified that a steward known to him as Doughbelly had told him on October 19 that the Stewards' Council had ordered the stewards to discharge those persons who were suing the union each time that any one of them was dispatched to a job. Doughbelly testified, however, that he said no such thing and that the Stewards' Council to the best of his knowledge had not given such an order.

Respondents contend that other testimony further detracts from the substantiality of the evidence from which the Board drew its conclusions. They point to the fact that between the initiation of his suit against the union and the hearing of his charges against respondents, Satchell was regularly dispatched and regularly worked at numerous longshore jobs, that he encountered trouble, if at all, on but three isolated occasions, and that he never brought the practices complained of to the attention of a responsible officer of any of the respondents.

In sum, respondents urge that the taking into account "whatever in the record fairly detracts from its weight" and viewing the evidence "in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," we must conclude that the findings of the Board are unsupported by substantial evidence. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63, 73. Despite respondents' protestations to the contrary, we think the question boils down to one of Satchell's credibility. The Trial Examiner believed Satchell. He assumed that Satchell was mistaken as to the precise date of the July incident, that the gang boss who took Simon's place on August 24 said that he was Simon even though he was not, and that Doughbelly told Satchell in October of the Stewards' Council's antipathy to those who were suing the union. The Trial Examiner descredited Doughbelly's denial in this regard.

Credibility is peculiarly the province of the Trial Examiner. N. L. R. B. v. West Coast Casket Co., 9 Cir., 1953, 205 F.2d 902, 906; N. L. R. B. v. San Diego Gas & Elec. Co., 9 Cir., 1953, 205 F.2d 471, 475; N. L. R. B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511, 514. His evaluation of oral evidence as reliable will not be disturbed unless the testimony which he credits is hopelessly or inherently incredible. N. L. R. B. v. Steel, Metals, and Hardware Fabricators, etc., Local 810, 2 Cir., 1960, 274 F.2d 688;

3. The Board noted that no exception had been filed in regard to the Trial Examiner's determination that in July at Encinal Terminal Local 10's steward had neither caused nor attempted to cause PMA to violate § 8(a) (3). Consequently, and seemingly with reluctance, the Board adopted the Trial Examiner's finding that Local 10 had at that time violated § 8(b) (1) (A) but not § 8(b) (2).

Although the Board did not specifically say so, the same reasoning apparently underlies its failure to hold that the International had violated § 8(b) (1) (A) in July through the agency of Local 10's steward, for the Board did conclude that there was an agency relationship between the stewards and the International as far as the August and October incidents were concerned.

N. L. R. B. v. Davisson, 9 Cir., 1955, 221 F.2d 802; N. L. R. B. v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, 490. The discrepancies in Satchell's story which respondents claim completely destroy the possibility that he was telling the truth seem to us to evince nothing more than a "confusion as to details" which assuredly does not warrant overturning the Trial Examiner's judgment as to Satchell's veracity. See Sunshine Biscuits, Inc. v. N. L. R. B., 7 Cir., 1960, 274 F.2d 738; N. L. R. B. v. Regal Knitwear Co., 2 Cir., 1944, 140 F.2d 746. Indeed the Court of Appeals for the Third Circuit recently accepted a Trial Examiner's findings on credibility in the face of an attack much like that presently pressed by respondents. Compare Paul M. O'Neill International Detective Agency, Inc. v. N. L. R. B., 3 Cir., 280 F.2d 936. Since Satchell's testimony dominates the record before us, and since we accept the credence accorded Satchell by the Trial Examiner, we conclude upon the record as a whole that the Board's findings of fact are supported by substantial evidence.

### The Agency Problems

The Taft-Hartley amendments to the National Labor Relations Act outlawed for the first time unfair labor practices committed by a labor organization or its agents. 29 U.S.C.A. § 158(b). Employers were also held accountable for the acts of their agents whereas previously they had been responsible for the conduct of any person who was acting in their interest even though such person might not be an agent under common law principles. Compare 29 U.S.C.A. § 152(2) with 29 U.S.C. § 152(2) (1946 ed.). And in § 301(e) Taft-Hartley provided that "in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C.A. § 185(e).

■ The purpose in holding employers chargeable only for the acts of their "agents" rather than for the acts of any person who acted in their interests was to limit an employer's responsibility to acts done within the actual or apparent scope of the acting person's authority. Since unions were also held responsible for the acts of their agents, Taft-Hartley rendered common law principles of agency equally applicable to both labor and management groups. See H.R.Rep.No. 245, 80th Cong., 1st Sess. 11 (1947); H.R.Rep.No.510, 80th Cong., 1st Sess. 31 (1947). Section 301(e) was designed to underscore the applicability of the general rules of agency law. Id. at 36. And Senator Taft, the life-force behind the bill as enacted, repeatedly remarked on the floor of the Senate that common law rules of agency were to govern the question of who acted for whom for purposes of determining culpability under the Act. 93 Cong.Rec. 4561, 6680, 7001 (1947). See also Int'l Ladies' Garment Workers' Union A. F. L. v. N. L. R. B., 1956, 99 U.S.App.D.C. 64, 237 F.2d 545, 551; United Mine Workers of America v. Patton, 4 Cir., 1954, 211 F.2d 742, 748, 47 A.L.R.2d 850. Consequently, the responsibility of all three respondents for the acts of the gang bosses and the responsibility of Local 10 and the International for the acts of the union stewards must be determined in light of the general law of agency.[4]

■ Local 10's constitution provides that each longshore gang shall elect a gang steward and that the stewards working on any one dock shall elect a dock steward. The functions of gang and dock stewards include determining that only members of respondent International or "permit" men, who need not be union members, are working and that all such men are paid up in their dues. In part at least, a steward of Local 10 acts as a watchman. He is charged with the duty to make sure that all the workers within his orbit fulfill the requirements mentioned above. And, impliedly, he is

---

4. We are not called upon to determine the International's responsibility for the acts of the steward during the July incident. See note 3, supra.

clothed with the power to take on-the-spot action in regard to those workers who do not meet the prescribed standards. For without such implied power the steward could not properly carry out the sentry's task assigned him by the Local. Cf. Cooley v. Eskridge, 1952, 125 Colo. 102, 241 P.2d 851, 855; Fireman's Fund Indemnity Co. v. Longshore Beach and Country Club, Inc., 1941, 127 Conn. 493, 18 A.2d 347, 350; Reifsnyder v. Dougherty, 1930, 301 Pa. 328, 152 A. 98, 100. The actions taken by the stewards to prohibit Satchell from working were within the general class of conduct impliedly authorized by the Local; that is to say, the stewards' actions were designed to insure that certain longshoremen did not work on the waterfront. That this general power was directed against Satchell, who was not among the particular group of longshoremen against whom the power should properly have been used, does not absolve Local 10 from responsibility under ordinary principles of agency law. Cf. Hinson v. United States, 5 Cir., 1958, 257 F.2d 178, 183; Paleockrasas v. Garcia, 2 Cir., 1950, 183 F.2d 244, 245: United States Steel Co. v. Butler, 1953, 260 Ala. 190, 69 So.2d 685, 687–688. Indeed, the present situation is not unlike that of an employee who is authorized to cut down designated trees belonging to his employer and who with zeal to increase the employer's profits fells timber belonging to a third party. See Restatement, Agency 2d, § 229 Comment a., Ill. 1 (1958). The Local authorized its stewards to safeguard advantages secured by the union at the bargaining table, yet the stewards exercised their power to achieve advantages to which the union was not entitled. Having created the stewards' power, the Local must take the responsibility if it is wrongly used. See Int'l Brotherhood of Teamsters, etc., Local 182, 2 Cir., 1955, 228 F.2d 83; United Brotherhood of Carpenters, Local 55, 100 N.L.R.B. 753 (1952), enforced per curiam 10 Cir., 1953, 205 F.2d 515; Int'l Brotherhood of Teamsters, Local 249, 116 N.L.R.B. 399 (1956).

N. L. R. B. v. P. R. Mallory & Co., 7 Cir., 1946, 237 F.2d 437 is unpersuasive. In that case mass demonstrations and work stoppages led by stewards of an electrical workers' local effectuated the discharge of an employee who was not a union member. The court, in holding that the stewards were not acting on behalf of the Local, relied heavily upon two factors to show the absence of an agency relationship: First, the stewards were selected by the single employee division in which they worked and could be removed by that group with the consent of the Local. The Local as a whole had no right to hire or fire stewards and did not compensate them for their work. Second, the president of the Local had advised the non-union worker that her right to be employed by the company was protected by federal law. The Local's president also told the company's employees that any activities carried on against the non-union worker would be their own responsibility.

The Mallory opinion is bereft of discussion dealing with the authority accorded the stewards by the Local which created the office in which they served. Decisive emphasis was placed, rather, on the facts that each steward had been selected by the employee division in which he worked and that each such division comprised but a small part of the Local's total membership. A similar method of selection was used to choose the stewards in the instant case, but we do not think it significant. Local 10's constitution authorizes its stewards to carry out certain duties and it is this authorization which provides the power that accompanies designation as a steward. The groups of workers who choose the stewards are but fulfilling a delegated task, the task of selecting those individuals who will be cloaked with the authority accorded stewards under the Local's constitution. The principal in this agency relationship is the entity providing the source of authority. That the recipient of the authority is named by someone other than its creator does not negate the agency's existence.

■ The second factor leading to the conclusion in Mallory that the stewards there were not acting as agents of the local union was that the Local had no policy to prevent non-union employees from holding jobs with the company, that the stewards acted contrary to union policy and to the express directions of the union president. See N. L. R. B. v. Local 135, Int'l Brotherhood of Teamsters, 7 Cir., 1959, 267 F.2d 870, 873; N. L. R. B. v. Chauffeurs, Teamsters & Helpers Local 364, Int'l Brotherhood of Teamsters, 7 Cir., 1960, 274 F.2d 19, 23. Again, a somewhat similar situation prevails in the present case, for the record before us indicates that the actions against Satchell were isolated occurrences and that the Local apparently had no established policy of keeping those who were suing the union off the job. Nonetheless, it is beyond doubt that an agent may well be acting within the scope of his authority even when he commits an act specifically forbidden by his principal. Hinson v. United States, supra, 257 F.2d at page 183; White Auto Stores, Inc. v. Reyes, 10 Cir., 1955, 223 F.2d 298, 302; Fields v. Sanders, 1947, 29 Cal.2d 834, 180 P.2d 684, 688, 172 A.L.R. 525; Int'l Longshoremen's Union, 79 N.L.R.B. 1487 (1948). Consequently, the absence of a union policy supporting the actions taken by the stewards against Satchell is inconclusive. The stewards acted within the general scope of the authority provided for in the Local's constitution, and the Local remains responsible for their conduct.

The Board held the International accountable for the actions of Local 10's stewards on the grounds that the International on behalf of itself and its affiliated locals had executed the collective bargaining agreement with PMA governing the hiring of Longshoremen in the Port of San Francisco, that the agreement provided for the operation of hiring halls, and that the International had delegated the task of administering the hiring halls and otherwise enforcing the contract to the locals, including Local 10. The Board concluded that Local 10 and the International had engaged in a joint enterprise affecting the employment of longshoremen, and that therefore, both the International and the Local were responsible for the acts of the Local's stewards against Satchell. Although the record suggests that the hiring halls provided for in the agreement were run by individual locals apparently with the blessings of the International, evidence indicating that the International asked the locals in any other way to enforce contract provisions is lacking. And no evidence was introduced to show in particular that the International empowered or even approved of the Local's grant of authority to its stewards to insure compliance with the contract.

■ The unfair labor practices charged against the International emanated not from procedures at the hiring hall but from actions taken by the stewards after Satchell's dispatching at the hall had been completed.[5] In other cases an international union has been considered engaged in a joint enterprise with a local or responsible for the activities of the local and its agents when the International admitted having joined the local in authorizing the general conduct which led to the unfair practices, see Int'l Longshoremen's Union, 79 N.L.R.B. 1487, 1513-14 (1948), when the international advised, sympathized or financially supported such general conduct, Cory Corp., 84 N.L.R.B. 972 (1949), when the International through its constitution or by-laws or by some other means commanded or required the activities resulting in the unfair labor practices, see N. L. R. B. v. Millwrights' Local 2232, 5 Cir., 1960, 277 F.2d 217, 221; American Newspaper

---

5. N. L. R. B. v. Int'l Longshoremen's, etc., Union, 9 Cir., 1954, 210 F.2d 581, presents a different situation. There the unfair labor practices were committed as part of the dispatching process itself, and the International was held responsible on the grounds that it had delegated the administration of the hiring hall to the local. To the same effect see N. L. R. B. v. Waterfront Employers of Washington, 9 Cir., 1954, 211 F.2d 946.

Publishers Ass'n, 104 N.L.R.B. 806 (1953), or when the International controlled the operations of the local, see Int'l Brotherhood of Teamsters, etc., v. United States, 4 Cir., 1960, 275 F.2d 610, 612–614. No evidence of such connections between the International and Local 10 was presented to the Board in the present case. Accordingly, we hold that on the record before us Local 10's stewards were not acting as agents of the International on the three occasions when they prevented Satchell from working at a job to which he had been properly dispatched.

The Working Rules of the Port of San Francisco, which augment the collective bargaining agreement between PMA and the International, provide that:

> "Gang bosses shall be selected and removed by the Labor Relations Committee. The Union may make recommendations for additions to the gang boss list. The gang boss is in complete authority and will be held responsible for the function of his gang. The gang boss shall have the right to discharge from his gang any man for incompetence, insubordination, or failure to perform the work ,as required in conformance with the provisions of this agreement."

The six-man Labor Relations Committee is composed of equal numbers of representatives of the union and the employers. Thus, both the creation of the gang bosses' authority and the selection of the men to exercise it are jointly in the hands of the International and PMA. The Board, in consequence, held both PMA and the International responsible for the acts of the gang bosses on August 24 and October 19.

The reasoning which led to our conclusion that the acts of the stewards are attributable to Local 10, see pages 563–565 of 283 F.2d, supra, applies similarly in ascribing the conduct of the gang bosses to the International and PMA. The latter organizations clothed the gang bosses with the power to discharge longshoremen, and that power was used to effectuate Satchell's discharge although for reasons which the grantor of the power apparently did not contemplate. Having created the gang bosses' authority, the joint principals must accept the responsibility if it is wrongly used. See N. L. R. B. v. Cement Masons No. Local 555, 9 Cir., 1955, 225 F.2d 168, 173, and authorities cited at page 564 of 283 F.2d, supra. Nonetheless, there is a decisive difference between the acts of the stewards and those of the gang bosses. Clearly, the stewards acted in order to further the interests of their principal, Local 10, by inhibiting law suits against it. The gang bosses, on the other hand, cannot be said to have been pursuing, in refusing to let Satchell work, the interests of their principals.

On August 24, when confronted with the steward's insistence that Satchell not be permitted to work, the gang boss attempted to find someone in authority at Local 10's offices. Failing to do so, he left the question of Satchell's employment up to the steward and the gang. On October 19, the gang boss hesitated not at all in discharging Satchell after being told by the steward that Satchell was suing the union and should not be allowed to work. The manner in which both gang bosses reacted to the stewards' demands demonstrates that they were pursuing interests different from those of the International or PMA. When a higher authority was sought. Local 10's offices were considered the place to look. No responsible agent of the employers was contacted, nor, even though Satchell held a valid dispatching card issued by the hiring hall operated by Local 2, ILWU, was an official of the International called to adjudicate what was apparently a conflict of interest between two affiliated locals. If the International's interests would have been furthered had the treatment accorded Satchell dissuaded lawsuits against Local 10, such interests also would have been and probably were disadvantaged by Satchell's inability to work even though he was duly dispatched by an affiliated local. In any event, we think the evidence shows that the conduct of the gang boss-

es was motivated solely by a desire to serve the purposes of Local 10 and that the gang bosses harbored no intention whatsoever of achieving the objectives of the authority granted them by PMA and the International.[6] And when an agent performs an act within the general scope of employment but with no intention to further the interests of his principal, the principal is not responsible for the agent's conduct. White Auto Stores, Inc. v. Reyes, supra, 223 F.2d at page 302; Novick v. Gouldsberry, 9 Cir., 1949, 173 F.2d 496, 500–501; Louisville & N. R. Co. v. Vinson, 1949, 310 Ky. 854, 223 S. W.2d 89, 91–92; Klause v. Nebraska State Bd. of Agriculture, 150 Neb. 466, 35 N.W.2d 104, 109 (1948).

In summation, Local 10, through the agency of its stewards, violated § 8(b) (1) (A) on a date near or about July 27, 1957. Similarly, it violated § 8(b) (1) (A) on August 24 and October 19 of the same year. Moreover, on the latter two occasions, Local 10 violated § 8(b) (2) by attempting to cause the employer to discriminate in violation of § 8(a) (3). These attempts were unsuccessful since, as we have held, the gang bosses did not act as agents of the employer in discharging Satchell. Nonetheless, the attempts were made and the unfair labor practices committed just as if the gang bosses, acting for PMA, had refused to discriminate against Satchell or had sought advice before acting from a more responsible agent of the employer and had been directed to disregard the stewards' demands. The International and PMA committed no unfair labor practices.[7]

### The Remedy

The Board's order can, of course, be enforced only as to Local 10 since we have concluded that neither the International nor PMA have committed an unfair labor practice. Therefore, we strike all portions of the order which require compliance from PMA or the International. Furthermore, we do not think that the Board's directive, even as applied solely to Local 10, can be enforced without modification. We are troubled by that part of the order which would have Local 10 cease and desist from:

"(a) Causing or attempting to cause Pacific Maritime Association, or its members, through union stewards *or otherwise*, to discriminate against A. T. Satchell *or any other prospective employee* for the reason that Satchell *or such other prospective employee* had filed suit against

---

6. In Cement Masons, supra, 225 F.2d at page 173, it was noted in dictum (the employer was not before the court) that having clothed a foreman with ostensible authority, management is responsible for acts which he commits within its apparent scope. This declaration must be viewed in light of the fact that the employer there agreed by contract to abide by the working rules of the union which required that all workers be cleared by the union before they be allowed to work. Consequently, when the foreman discharged a worker because he did not have union clearance, the foreman acted as much in the interests of the employer as for the union. He was acting for both in fulfilling on behalf of each its contract obligation. Here, on the other hand, the contract obligations of PMA and the International were in no way carried through by the acts of the gang bosses.

The True Knowledge case is inapposite. There, this Court held that the union caused discrimination against True Knowledge by withholding union clearance from him. This caused the gang boss to refuse to put Knowledge on his gang. Impliedly, although the employer was not charged with an unfair labor practice, the action of the gang boss was attributed to management. See N. L. R. B. v. Int'l Longshoremen's, etc., Union, 9 Cir., 1954, 214 F.2d 778. No discussion was accorded the intent of the gang boss in refusing to hire Knowledge. But as the Board's decision in the case shows, responsible employer representatives knew all about Knowledge's predicament yet did nothing about it. See 102 N.L.R.B. 907, 908–9 (1953). Accordingly, it would seem that there the employer tacitly ratified the gang boss' action while here it did not.

7. Our determination that PMA committed no unfair labor practice renders unnecessary consideration of the argument that the employer was denied due process of law by an arbitrary and discriminatory application of the Board's remedial powers.

Local 10 in an attempt to regain membership in Local 10;

(b) In any like or related manner causing or attempting to cause Pacific Maritime Association or its members to discriminate against A. T. Satchell *or any other prospective employee* in violation of Section 8(a) (3) of the Act;

(c) Engaging in [any] conduct designed to prevent A. T. Satchell *or any other prospective employee of Pacific Maritime Association or its members* from securing employment in reprisal for bringing legal action against Local 10, or in any like or related manner restraining or coercing [employees] in the exercise of [their] right to engage in, or to refrain from engaging in, any and all of the concerted activities guaranteed to [them] by Section 7 of the Act, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized by Section 8(a) (3) of the Act." (Brackets and italics are ours.)

 The Board cannot restrain practices which it has neither found to have been pursued nor to be related to proven unlawful conduct. Communications Workers of America, A. F. of L.–C. I. O. v. N. L. R. B., 1960, 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896. See also Morrison-Knudsen Co. v. N. L. R. B.,

9 Cir., 1960, 276 F.2d 63, 76. A broad order will be modified unless the evidence supports a proclivity for unlawful action or unless a finding relating to the likelihood of similar violations is made either by the Board or the Trial Examiner. See N. L. R. B. v. Local 476, United Ass'n of Journeymen, etc., Plumbers, 1 Cir., 1960, 280 F.2d 441. In the instant case three isolated infractions of the Act were proved and no proclivity for unlawful behavior was made out by the evidence. There was no finding that similar violations were likely. Indeed, the infrequency of the unlawful actions taken against Satchell indicates the contrary. The record shows only that the Local's stewards took sporadic action against Satchell in order to dissuade him from continuing his suit against Local 10. The Board's order must conform to the violations which the evidence reveals.[8]

Accordingly, the order of the Board is modified by striking therefrom all the italicized portions appearing in the quotation above. The bracketed words "any," "employees," "their" and "them" are replaced with the words "similar," "Satchell," "his" and "him" respectively. Since the order may be enforced only against Local 10, the requirement that the Local "Jointly and severally with the Pacific Maritime Association make whole A. T. Satchell * * *" is modified by striking the words "Jointly and severally with the Pacific Maritime Association".[9]

Enforced as modified.

---

8. It is true that in July, Meisner, another of those who were suing the union, was chased from a job to which he had been dispatched. But we do not think that this single piece of evidence involving someone other than Satchell suffices to show that proclivity for unlawful conduct which is needed to justify an order as broad as that which the Board has drawn.

9. Respondent Local 10 urges that the phrase "in any like or related manner" appearing twice in the segment of the

Board's order quoted in this opinion is also too broad to be enforced on the present record. The evidence, however, did show several, specific, unlawful acts directed toward Satchell. We think that the Board was thusly warranted in restraining like or related violations in regard to Satchell in the future. A "like or related manner" is something different from "any other manner." The Board's prohibition in this case applies only to the kind of conduct which the evidence demonstrates has occurred more than once in the past.