National Bond & Investment Co. v. Whithorn.

Dec. 9, 1938.

GEORGE E. WADE, NOLAN H. TEPPER, MILTON SILBERG and LEONARD M. COHEN for appellant.

LEE S. JONES for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

Appellee, William Whithorn, brought this action for false imprisonment against the appellant, National Bond and Investment Company, in the Jefferson circuit court and on a trial before a jury verdict was rendered in his favor for $700 compensatory damages and $900 punitive damages. Judgment was entered on this verdict and from that judgment this appeal is prosecuted.

Appellant contends (1) that the court erred in refusing to direct a verdict for appellant; (2) that the court erred in instructing the jury that punitive damages might be awarded, and (3) that the damages are excessive.

The evidence discloses that the appellant had, or at least claimed to have, a conditional sales contract on a car in possession of appellee, and that payments due under this contract had not been made. Appellant desired to repossess the car and assigned its employees, O'Brien and Baer, to this task. Baer appears to have been a high-powered repossessor in the employ of appellant in Chicago and was imported to Louisville for some special work along this line. These employees,

after making inquiry from a relative of appellee, and after a little "fast work" connected with this inquiry, learned where appellee lived and by so doing managed to find him driving the car on a street in Louisville. In their car they followed appellee in his car for some distance and hailed him down for the purpose of making a repossession.

There is considerable conflict in the testimony as to what occurred between appellee and these two employees of appellant on the occasion of this repossession, but the jury evidently accepted appellee's version of the melee, as it was entitled to do in view of the conflict in testimony between him and O'Brien and Baer.

In determining whether or not the trial court should have directed a verdict for appellant we must also adopt appellee's version of the affair, which is in substance as follows: When O'Brien and Baer hailed appellee he thought they were officers and stopped his car, whereupon O'Brien got out of his car, walked up to appellee's car, and invited him to get out and come back and talk to Baer. This appellee refused to do, so finally Baer also came to appellee's car and from that time things began to move rapidly. Appellee was informed that these employees desired to repossess the car and was notified to get out and take his personal belongings. Appellee demanded evidence of their authority, which they assured him they had, but their assurance did not satisfy appellee and the argument as to authority continued for some time. The repossessors became impatient at being balked of their quarry and finally one of them said, "Don't you move. this machine, I will have an officer here in about two minutes." One of the men said to the other, "Go over there and get the officer; we will have him locked up and sent to jail." Thereupon O'Brien departed from the scene of battle, remaining away about ten minutes, and while he was gone appellee and Baer continued their conversation and apparently took a smoke together, but appellee refused to fall for the blandishments used by Baer in his endeavor to persuade appellee to permit the repossession to be made. After O'Brien came back he made the statement that "the officers will be here any minute." Shortly after O'Brien returned, a wrecker, which had been called by O'Brien, pulled up and one of the appellant's employees motioned for the wrecker to pull in front of

appellee's car to hook on, whereupon appellee started the motor in his car for the purpose of driving off, but O'Brien raised the hood of the car and jerked loose the distributor wire. Appellee, not desiring to see his car put hors du combat, opened the door of his car and started out after him. When appellee opened the door of his car and started out, Baer attempted to reach through the window of the car on the other side and get the car key, but appellee sensing what was in the wind, beat Baer to the key, and this seemed to "peeve" the repossessors very much. O'Brien then said, "He has acted so smart I will have him put in jail," and got in his machine and left. He came back in a short while and it does not clearly appear whether or not he called the police officers, but at any rate a police officer, pursuant to a telephone call from some one, showed up a while afterwards.

When O'Brien returned from this second departure Baer directed the driver operating the wrecker to hook to appellee's car and pull out with it, but in view of appellee's vehement protests the driver of the wrecker hesitated to act, but after repeated demands by O'Brien finally coupled up with appellee's car and hoisted the front wheels off the ground. Baer then climbed in appellee's car and the wrecker started pulling the car down the street, whereupon appellee put on the emergency brake and threw the car into reverse, thereby managing to stall the wrecker and bring the car to a stop after it had been pulled down the street something like 75 to 100 feet. During the progress down the street, appellee who says he tried to prevent Baer from getting in the car with him, attempted to eject Baer from the car by kicks on the shins, which Baer says in his testimony were rather forcefully administered, but his attempts to dislodge this Chicago repossessor were wholly unavailing.

While all this was occurring numerous cars were passing up and down the street; some of them stopping and looking and then driving on. In other words, the passing public seemed to realize that a good act was being put on and did not miss the opportunity to enjoy at least a portion of it. After appellee had managed to bring the procession to a halt by stalling the wrecker, a policeman came up and inquired as to the meaning of the controversy, and the contestants on the respective

sides stated their case. The policeman says that he refused to pass on the merits of the controversy, but he did demand appellee's driver's license, which it appears appellee had but had left at home. Appellee seemed to think the policeman was taking sides with the repossessors and became rather angry, demanding the policeman's badge number and name, whereupon the policeman placed him under arrest. The drama of repossession ended with the policeman departing with appellee in tow and O'Brien and Baer departing with appellee's car in tow, the result being a complete and satisfying repossession, at least satisfying in its results to appellant's employees, O'Brien and Baer, but highly unsatisfactory to appellee.

It appears that nothing was done about the charge against appellee for not having a driver's license. He apologized to the policeman for being angry, and this apparently satisfied the gentleman and appellee was "permitted to go on his own bond."

If appellant had a valid conditional sales contract on appellee's car, and he was behind in the payments, appellant had the right to repossess the car if it could do so peaceably, but, of course, had no right to create a breach of the peace in doing so, or to put appellee under any kind of restraint, or to use any force directed against him in making the repossession. C. I. T. Corporation v. Short, 273 Ky. 190, 115 S. W. (2d) 899.

Appellant contends the transaction above recited did not amount to false imprisonment, its theory being that appellee was in no wise restrained or impeded, and that he was perfectly at liberty at any time to go his way; that this evidence does not show that O'Brien and Baer prevented him from proceeding in any direction he desired, and cites many authorities which it insists sustains this position. It relies mainly on the case of Great Atlantic & Pacific Tea Company v. Billups, 253 Ky. 126, 69 S. W. (2d) 5, where one of the company's employees went out of the store and confronted a woman and accused her of not paying for some candy she had bought, and demanded that she return to the store with him to straighten the matter out, which she refused to do. This court held that this was not a false imprisonment, because there was nothing in his conduct or words indicating an intention on his part to take the woman into his custody or to subject her to his control,

or reasonably calculated to lead her to believe that she was being placed under restraint or deprived of her liberty; that what he did was not sufficient to induce a reasonable apprehension of force if she refused to submit.

We are unable to agree with appellant's contention that the facts in that case are similar to the present case. A reading of the evidence we have quoted above makes it immediately apparent that appellee, in the present case, was placed under restraint by O'Brien and Baer. They had him in his car under forcible control, being pulled down the street some 75 to 100 feet, against his vehement protests, and we are firmly of the opinion that such conduct on their part was a false imprisonment.

It is true, as appellant argues, that appellee was at liberty to depart and these employees were not preventing him from doing so, but the result of his departure would have been an automatic parting with his automobile, which he did not desire to part with, and which he did not have to part with, and which O'Brien and Baer had no right to take over his protests. While he was in this car he was in a place he had a legal right to be, and in which neither O'Brien nor Baer had a legal right to be, by force, and when these men hooked the wrecker on and hoisted the front wheels in the air, forcibly dragging appellee down the street in his car, this was unquestionably a restraint imposed upon him and a detention of his person, such as constitutes a false imprisonment.

As said by this court in Great Atlantic & Pacific Tea Company v. Billups, supra, 69 S. W. (2d) 6, relied on so strongly by appellant as controlling in the present case, "Any exercise of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."

It is apparent that in the present case there was an exercise of force by appellant by which appellee was deprived of his liberty and compelled to go where he did not wish to go and this constitutes a false imprisonment.

We are of the opinion that appellant's contention that the court should not have instructed the jury that

they might award punitive damages is equally without merit. Punitive damages are proper when a wrongful act is done without reasonable excuse and with wanton and willful disregard of the rights of another, so that the jury would be warranted in finding that the acts were done maliciously, 11 R. C. L. 821; Louisville & Nashville Railroad Company v. Ritchel, 148 Ky. 701, 147 S. W. 411, 41 L. R. A., N. S., 958, Ann. Cas. 1913E, 517; Memphis & Cincinnati Packet Company v. Nagel, 97 Ky. 9, 29 S. W. 743, 16 Ky. Law Rep. 748; Sternberg v. Hogg, 254 Ky. 761, 72 S. W. (2d) 421; C. I. T. Corporation v. Short, supra.

In the present case, if we accept appellee's testimony, which the jury evidently did, the actions of appellant's employees were high handed and were done in an oppressive manner, with a wanton and willful disregard of appellee's rights, and the court was justified in permitting the jury to award punitive damages if they believed that these acts were maliciously done.

The only feature of this case which has troubled us to any extent whatever is the amount of damage awarded, both compensatory and punitive. As to the compensatory damages, appellee states that he was rendered very nervous by his set-to with O'Brien and Baer, and was unable to sleep for several nights and had no appetite for about two weeks; that he was unable to go to work the following day; that several days thereafter his family physician, while visiting one of his children, prescribed a sleeping potion for him and thereafter he was enabled to sleep by using it for some little time; that he lost about ten pounds in weight, which he regained after his appetite returned, some two weeks after the accident.

We confess that $700 in compensatory damages seems high, but we are not permitted to exercise our judgment on this matter, for while it is higher than we would have awarded, yet it is not so high as to strike us at first blush as being the result of passion and prejudice on the part of the jury.

The punitive damages are also high, but neither are they so high as to indicate to us that they were the result of passion and prejudice on the part of the jury. We must remember that if appellee's version was correct, appellant's employees acted in a high-handed man-

ner, with wanton disregard of appellee's rights and on a public street of the city of Louisville, which necessarily resulted in shame, humiliation and mortification being visited on him. The jury in imposing punitive damages amounting to $900 evidently determined to teach appellant a lesson as to future repossessions, to make sure that hereafter no such high-handed oppressive methods should be indulged in by its agents, and we are not prepared to say they went beyond all legal bounds in fixing this amount as a punishment and a warning.

In the case of Engleman v. Caldwell & Jones, 243 Ky. 23, 47 S. W. (2d) 971, in which this court upheld an award of $5,000 punitive damages, numerous cases in this court are reviewed in which the court discussed the question of whether or not punitive damages were excessive and it is not necessary for us to review those cases again. Viewed in the light of that case and the authorities therein considered, we are firmly of the opinion that this award of $900 punitive damages is not so excessive as to indicate that it was the result only of passion and prejudice on the part of the jury.

Wherefore, the judgment is affirmed. The Whole Court sitting.