[No. D003287. Fourth Dist., Div. One. Feb. 10, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
TRAVIS RAY RIDDLE, JR., Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I-III, V-VIII, and X-XI.

## COUNSEL

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TODD, J.—**

### STATEMENT OF THE CASE

Travis Ray Riddle, Jr., after trial by jury, was convicted of the following: Attempted murder (Pen. Code, §§ 664/187);[2] robbery (§ 211); mayhem (§ 203); assault with firearm (3 counts) (§ 245, subd. (a)(2)); false imprisonment (5 counts) (§ 236); attempted forcible rape (§§ 664/261, subd. (2)); lewd and lascivious acts on child under 14 (§ 288, subd. (b)); forcible rape (3 counts) (§ 261, subd. (2)); sodomy (§ 286, subd. (c)) and oral copulation (2 counts) (§ 288a, subd. (c)).The jury found as true allegations of personal firearm use in the commission of these crimes. Riddle raises numerous issues on appeal from these convictions. We affirm, as modified, and remand for resentencing on one count.

### FACTS

The events in this case took place in Bombay Beach during the evening hours of October 15, 1983. Riddle, then age 17, and his sister, Sherry, age 13, were at home while their parents were away in Indio. Sherry invited Angela, age 13, Judy, age 13, and Lucius, age 10, over to the Riddle residence for a party. When they arrived, Riddle was drinking beer in the house. After a period of time, Angela left the Riddle residence with some of the other young people. She intended to go to her house and check in with her father. Once outside, the group ran into Sean, Mike, and Chris, and all went back

---

[2] All statutory references are to the Penal Code unless otherwise specified.

to the Riddle residence. Once inside, everyone drank some beer and Riddle and Sean smoked some marijuana.

Then, all but Sherry and Riddle left the Riddle residence. Riddle appeared to be drunk by that time. He had purchased beer and malt liquor at a store in Bombay Beach earlier. After the group left for the second time, Sherry came out and yelled that Riddle became sick and asked Angela to help. The group returned to the Riddle residence again and found Riddle had vomited and was lying on the bedroom floor. The young people dragged Riddle into the shower, removed his clothing and, after completing the cold shower, put him into the bed in the bedroom. After the young people departed the bedroom, Sherry told Angela that Riddle had asked that she and Angela come into the bedroom. Angela remained only a short time but returned to the bedroom again after Sherry said that Riddle said he wanted to kill himself. Riddle was sitting up in the bed and mentioned knives to Angela. Others in the group found knives in the kitchen and hid them from him.

Angela was called into the bedroom a third time and found Riddle sitting up in bed. Angela stood at the foot of the bed and Riddle said, "Come closer." He asked her whether she had ever been raped. Angela responded, "No." Riddle then pulled out a gun, told Angela to be quiet and to take off her clothes. Angela began to cry. Riddle cocked the gun and again told her to be quiet. Angela removed her outer shirt. Sherry came back into the bedroom and Riddle put the gun behind his back, pulling Angela down to the bed near him. Riddle pulled down Angela's tube top. Sherry began crying. Sean heard the crying and entered the bedroom. Sean observed that Angela's left breast was exposed. Sean grabbed Angela by the arm and pulled her out of the bedroom. Angela told Sean Riddle had pulled a gun on her. Sean questioned Riddle about the events in the bedroom. Riddle at first said there was no gun and then said, "It was a toy gun." Riddle told Sean the gun was in the closet. Sean found a real gun in a holster, a .357 magnum revolver. Sean showed the gun to Angela. She identified it as the one Riddle had pulled on her.

Angela and Judy then ran from the premises, hiding in a neighbor's patio. While hiding, they heard two gunshots, about 30 seconds apart. They ran to another hiding spot and then heard a third shot, after which they saw a dune buggy drive by. They screamed for help but the response from the driver of the dune buggy as it came to a stop was, "Help. I have been shot." The girls then saw Riddle run up to the dune buggy and reach for the person in it.

After Angela and Judy ran away from the Riddle home, Sean again entered the bedroom, reholstered the gun and asked Riddle why he had done what

he did. Riddle gave no response but began to load the gun in the closet area. Sean quotes Riddle as stating, "[I] was horny and [I] hadn't had a piece of ass in a long time." After the gun was loaded, Sean stated, "You aren't going to take that gun anywhere." Riddle pointed the gun at Sean's forehead and Sean said, "You won't pull that trigger." Riddle then cocked the gun. Sean immediately ran from the bedroom and outside. Sean picked up a handful of rocks and threw them at Riddle as he came out the door in the hope Riddle would drop the gun. Riddle pointed the gun at Sean's head and fired. Sean heard a high-pitched whine go right past his head. The first shot was fired from about 10 to 15 feet away. Sean ran down the driveway and when he was about half way down heard a second shot. It went by the right side of his head. He ran down the street and then heard a third shot behind him. Sean ran to the Bombay Market and then crouched in a ditch by the Ski Inn. He saw Riddle at the Ski Inn near a dune buggy, pointing a gun at its driver. He saw Riddle drag the driver out of the dune buggy, drive the dune buggy in two circles and crash it into a propane tank.

Brad, the driver of the dune buggy, recalled leaving a friend's house about 10 p.m. on October 15th. He was traveling about 35 miles per hour until he saw Riddle at the side of the road. He heard a large explosion and then could not feel his legs. Brad did not hear Riddle say anything. He felt blood on his legs and realized he had been shot. He coasted about a block and a half to the Ski Inn and called for help. Riddle ran to the driver's side of the dune buggy and pointed the gun at Brad's head. Riddle ordered Brad out of the dune buggy. Brad responded he couldn't move and then pretended to faint fearing he was going to be shot again. Riddle dragged all but Brad's lower legs out of the dune buggy. Riddle jumped into the dune buggy and drove it away, causing Brad to fall to the ground. Riddle drove the dune buggy erratically, crashed it and ran away from the scene. Brad was paralyzed and unable to move from the place where he had fallen.

Angela had also seen the dune buggy incident from her hiding position. She recognized the shooter was Riddle because of his profile and his shoulder-length hair.

Shortly after 10 p.m. on October 15, 1983, Riddle ran to the residence of Theresa, a former girlfriend. It was a two-bedroom trailer home. Ronald and Larry, Theresa's brothers, were playing catch with a football outside the trailer home. Riddle grabbed Larry's neck and pointed a .357 magnum revolver at him. Two border patrol agents approached the trailer home and Riddle told them, "Get the fuck out of here." Then he forced Larry into the trailer home. Larry's parents were in the trailer living room. Riddle pointed the gun at Larry's mother, said he had already shot someone and it wouldn't hurt to shoot another. Riddle ordered both parents and Larry out of the

home. All three promptly obeyed Riddle's order. Theresa came out of Larry's room and Riddle ordered her back into the room. Riddle and Theresa were in the trailer home for about an hour and a half before Riddle finally came out and surrendered. There was no additional contact with Larry or the two parents.

In response to inquiry from a peace officer, Riddle responded, "Yeah, I'm inside and if anybody tries to come inside, I will kill her and anybody else." Riddle stated he had already shot one guy and would shoot anybody else.

Theresa, 13 years old at the time, first met Riddle in Winterhaven, where she had sex with him two or three times. On the night in question, she heard yelling in the living room and ran out into the hall. She saw Riddle holding a gun to Larry's head. After Riddle ordered her back into her brother's room, he ordered her to undress and lay on the bed. Riddle attempted intercourse with Theresa but was unable to achieve full penetration. He then directed Theresa to lie on the floor, which she did. Riddle told her he wanted her to have his baby because he was going to jail. He again attempted intercourse with Theresa. This time he achieved full penetration.

Riddle then took Theresa to her mother's room because someone was yelling through Larry's window. Riddle kept his arm around Theresa and the gun at her back. Riddle obtained some cigarettes and looked for vaseline. Back in the mother's room, Riddle shut the door and pushed the nightstand against it, then turned off the lights. After lubricating his penis with hair conditioner, Riddle had intercourse with Theresa again on the bed. He ordered Theresa to the floor and they had intercourse again. Then they got up on the bed and Riddle put his penis in Theresa's mouth. Riddle rolled Theresa over and sodomized her. Again, he made Theresa put his penis in her mouth. He directed her onto the floor again and while trying to mount the girl, the gun accidently went off by her ear. Riddle told Theresa he would leave if she had sexual intercouse with him once again. This was accomplished. Riddle then exited the trailer home and surrendered to officers who were surrounding the dwelling.

Brad was taken to Pioneers Memorial Hospital where it was determined the bullet was in his spine, paralyzing him from the waist down. Doctors chose not to remove the bullet and diagnosed Brad will be confined to a wheelchair for life. Theresa was examined at a hospital in El Centro. She had swelling at the opening of the rectal area and swelling at the vaginal area also. Semen was found in her rectum.

A physical examination of Riddle was conducted. No drugs were detected in his blood and his blood alcohol level was analyzed at 0.07 percent.

In the desert area west of Bombay Beach, sheriff's deputies found a pair of boots and a sawed-off shotgun which belonged to Riddle.

On May 5, 1984, Riddle escaped from a locked juvenile facility. He was apprehended in Stockton, California, three weeks later and confined in jail.

DISCUSSION

I-III*

. . . . . . . . . . . . . . . . . . . .

IV

■ Riddle next contends his convictions for false imprisonment of Theresa's mother and father (counts 17 and 19) are not supported by sufficient evidence and must be reversed. After Riddle entered the trailer home of this family, he pointed his gun at Theresa's mother, stated he had already shot someone and it wouldn't hurt to shoot another, and then ordered both parents out of the house. The parents promptly complied with this order. The issue presented is whether these two persons were falsely imprisoned by being forced out of their home to the freedom of the rest of the world outside? Of significance is the additional fact that Theresa was forced to remain inside the trailer home with Riddle, who was still armed with a gun.

Section 236 defines the crime of false imprisonment as: "False imprisonment is the unlawful violation of the personal liberty of another." "In *People* v. *Agnew* [(1940)] 16 Cal.2d 655 [107 P.2d 601], the court stated at page 659: 'In defining false imprisonment, it is said in 22 American Jurisprudence, at page 359, "In order to constitute a case of false imprisonment, it is essential that there be some restraint of the person; but it is not necessary that there be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, *or to go where he does not wish to go,* is false imprisonment. The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both. . . ." ' (See also *People* v. *Wheeler* [(1887)] 73 Cal. 252 [14 P. 796]; *Ex parte Keil* [(1890)] 85 Cal. 309 [24 P. 742].)" (*People* v. *Zilbauer* (1955) 44 Cal.2d 43, 51 [279 P.2d 534], italics added.)

---

*See footnote, *ante,* page 222.

In *People* v. *Wheeler* (1887) 73 Cal. 252 [14 P. 796] (overruled on other grounds in *People* v. *Christian* (1894) 101 Cal. 471, 475 [35 P. 1043]), defendant Wheeler made a down payment on the purchase of land from the University of California. The land was actually federally owned, public land. A former employee, Standley, filed a federal land claim on a quarter section, part of which included land which Wheeler thought he had begun to purchase. Wheeler and his agents came to the land, found Standley there and ordered him from the property. They then bound him with ropes and forcibly removed him from the land, first by boat and then by wagon. When transported a significant distance from the area, Standley was released. The court stated: "Upon these facts, it seems to us that no plausible pretense of justification can be put forth. False imprisonment is the unlawful violation of the personal liberty of another (Pen. Code, sec. 236); and every element of the offense seems to have been fully and clearly shown." (*Id.* at p. 256.) *Wheeler* is similar to the case before us since Standley's liberty was restrained by forcibly removing him from the property where he had a legal right to be. Theresa's parents submitted to the threat of Riddle's gun while Standley was forcibly removed with ropes, a boat and a wagon. In each case, at the conclusion of the restraint, the victim's liberty was restored. In both cases the victims were compelled to go where they did not wish to go.

We find no other California cases supporting Riddle's contention he cannot be guilty of false imprisonment because he forcibly directed these parents from their home to freedom in the outside world. However, false imprisonment has been established under similar factual circumstances in other jurisdictions.

In *National Bond & Investment Co.* v. *Whithorn* (1938) 276 Ky. 204 [123 S.W.2d 263], auto repossessors hailed a man in his auto. The man refused to leave his position in the auto so the repossessors attached their tow truck and proceeded to drag the auto down the road with the man still in it. In finding a false imprisonment, the court held: "It is apparent that in the present case there was an exercise of force by appellant by which appellee was deprived of his liberty and compelled to go where he did not wish to go and this constitutes a false imprisonment." (*Id.* at p. 266.)

*People* v. *Agnew, supra,* 16 Cal.2d 655, reviews *Martin* v. *Houck* (1906) 141 N.C. 317 [54 S.E. 291], wherein defendant peace officers went to plaintiff's home outside of town after it was reported plaintiff had stolen shoes. After defendants accused plaintiff of theft, he denied the charge, but when threatened with arrest, responded he would appear voluntarily in town to answer their charge. Defendants told plaintiff he could appear the next day. Plaintiff did so, but no warrant was ever issued and no formal theft charge was ever made. In finding a false imprisonment, the court said: "It is not

necessary . . . that the person restrained of his liberty should be touched or actually arrested. If he is ordered to do or not to do the thing, to move or not to move against his own free will, if it is not left to his option to go or stay where he pleases, and force is offered, . . . the offense is complete upon his submission." (*Id.* at p. 293.)

While these two decisions arise as civil tort complaints, the principle at hand is identical. False imprisonment, civil or criminal, is a violation of one's personal liberty.

The personal liberty of each of Theresa's parents was unlawfully restrained when Riddle accomplished their removal from the trailer home under threat of the firearm. Though the restraint was short in time and distance, the restraint was real. This claim of error is without merit and the convictions and sentences thereon are affirmed.

V-VIII*

. . . . . . . . . . . . . . . . . . . . .

IX

 Next, Riddle argues the trial court erroneously ordered a full, separate, and consecutive sentence under section 667.6, subdivision (d) on count 24 (forcible rape) in relation to count 23 (forcible rape).

*People* v. *Craft* (1986) 41 Cal.3d 554, 561 [224 Cal.Rptr. 626, 715 P.2d 585], establishes the validity of Riddle's contention, as is conceded by the People. Justice Mosk, in speaking for a unanimous Supreme Court, states: "In view of the purpose that we attribute to the Legislature, it is more reasonable to construe 'separate occasions' in a narrow manner. Specifically, we hold that subdivision (d) only applies to offenses against the same victim between which the perpetrator temporarily lost or abandoned the opportunity to continue his attack: such opportunity is lost when the victim becomes free of any ongoing criminal activity; it is abandoned when the offender keeps the victim within his control but engages in some significant activity unrelated to continuing his attack. This interpretation effectively distinguishes multiple offenders who commit crimes against a single victim on separate occasions from those who merely assault a victim several times in one uninterrupted sequence of events.

---

*See footnote, *ante,* page 222.

"As opposed to the person who commits several rapes on a single occasion, the one who rapes his victim on 'separate occasions' seems to deserve the harsher punishment automatically."

Following submission of this matter, counsel for Riddle has called our attention to *People* v. *Johnson* (1986) 188 Cal.App.3d 182 [232 Cal.Rptr. 202]. Further, *People* v. *Cortez* (1986) 187 Cal.App.3d 1152 [232 Cal.Rptr. 374] has also spoken to the issue treated in *Johnson.* These cases hold section 667.6, subdivision (c)[5] and subdivision (d),[6] as they read on the date pertinent to this case, precluded full force consecutive terms for violations of sections 286, subdivision (c) (sodomy) and 288a, subdivision (c) (oral copulation). This result flows from the disparity between the statutory definitions of sodomy[7] and oral copulation[8] and the requirement of "force, violence, duress, menace or *threat of great bodily harm*" (italics added) for section

---

[5]Section 667.6, subdivision (c) reads as follows: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of subdivision (2) or (3) of Section 261, Section 264.1, subdivision (b) of Section 288, Section 289, or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace or threat of great bodily harm whether or not the crimes were committed during a single transaction. If such term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time such person would otherwise have been released from imprisonment. Such term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to such term shall not be merged therein but shall commence at the time such person would otherwise have been released from prison."

[6]Section 667.6, subdivision (d) reads as follows: "A full, separate, and consecutive term shall be served for each violation of subdivision (2) or (3) of Section 261, Section 264.1, subdivision (b) of Section 288, Section 289, or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace or threat of great bodily harm if such crimes involve separate victims or involve the same victim on separate occasions.

"Such term shall be served consecutively to any other term of imprisonement, and shall commence from the time such person would otherwise have been released from imprisonment. Such term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to such term shall not be merged therein but shall commence at the time such person would otherwise have been released from prison."

[7]Section 286, subdivision (c) reads as follows: "Any person who participates in an act of sodomy with another person who is under 14 years of age and more than 10 years younger than he or she, or when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person or where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat shall be punished by imprisonment in the state prison for three, six, or eight years."

[8]Section 288a, subdivision (c) reads as follows: "Any person who participates in an act of oral copulation with another person who is under 14 years of age and more than 10 years younger than he or she, or when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person or where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat shall be punished by imprisonment in the state prison for three, six, or eight years."

667.6, subdivisions (c) or (d) to be applicable. Sodomy and oral copulation required only "force, violence, duress, menace, or fear of *immediate and unlawful bodily injury*" (italics added). Without a special jury finding of a *threat of great bodily harm,* neither sodomy nor oral copulation could be sentenced under section 667.6, subdivision (c) nor subdivision (d) as it read in 1985. Though the Legislature has now amended these sections to conform to the definitions of sections 286, subdivision (c) and 288a, subdivision (c), these changes are not applicable to this case.[9] Riddle contends the same result follows for the violations of section 261, subdivision (2).

Riddle extends this problem beyond its logical limit. This issue has been fully treated by Justice Sims in *People* v. *Foley* (1985) 170 Cal.App.3d 1039, 1050-1057 [216 Cal.Rptr. 865]. ■ In *Foley,* Justice Sims reasons by enacting section 667.6, subdivisions (c) and (d), the Legislature intended to penalize sexual acts accomplished against the victim's will, usually by force. This common principle applied to the statutory definitions of sections 261, subdivision (2) (forcible rape); 261, subdivision (3) (rape where will overcome by drug, etc.); 264.1 (rape in concert by force); 288, subdivision (b) (lewd act by force); and 289 (foreign object rape by force). However, the definitions of section 286 and subdivision (c) of section 288a did not fit this common principle since each such section provided an alternative ground for penal liability, i.e., commission of the proscribed sexual acts "with a minor under age 14." "They predicated criminality not exclusively upon coercive conduct but also upon an age differential between perpetrator and victim. The fact that sexual acts are undertaken with a minor under age 14 does not necessarily imply the acts have been coerced. (See *People* v. *Cicero* (1984) 157 Cal.App.3d 465, 483 [204 Cal.Rptr. 582].) Consequently, the subject clause—'by force, violence, duress, menace, or threat of great bodily harm'—was apparently necessary to limit the application of subdivision (c) to violations of section 286, subdivision (c) and 288a, subdivision (c) based on force and not age differential. This conclusion is also in accord with the general rule that, unless context or evident meaning require a different construction, a qualifying clause is ordinarily to be applied to the words or phrases immediately preceding it and not to others more remote. (See *White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191]; *People* v. *Corey* (1978) 21 Cal.3d 738, 742 [147 Cal.Rptr. 639, 581 P.2d 644]; *People* v. *Cruz* (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].)" (170 Cal.App.3d at p.1052.)

We adopt the reasoning of *Foley* and hold the modifying clause "by force, violence, duress, menace or threat of great bodily harm" of section 667.6, subdivision (c), only applies to violation of sections 286 and subdivision (c)

---

[9]Statutes 1985, chapter 401, section 1.

of 288a. It has no application to violations of section 261, subdivisions (2) or (3).

■ Therefore, the trial court, on remand, may yet pronounce the same sentence for count 24, but only through the proper exercise of its discretion under section 667.6, subdivision (c) which will require a statement of reasons. (*People* v. *Wilson* (1982) 135 Cal.App.3d 343, 352-353 [185 Cal.Rptr. 498].) Unless section 667.6, subdivision (c) is invoked, a concurrent sentence is mandated for count 24.

X-XI*

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The section 12022.5 enhancements are hereby stricken in count 20, and the remaining sentence for that count is stayed. The conviction on count 22 is stricken. The case is remanded for resentencing on count 24 and for preparation of an amended abstract of judgment. The amended abstract of judgment should also reflect the three-year firearm use enhancements to counts 23 and 24 were imposed pursuant to section 12022.3, subdivision (a).

Wiener, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied March 11, 1987, and the opinion and judgment were modified on March 25, 1987, to read as printed above.

---

*See footnote, *ante,* page 222.