Filed 1/21/16  P. v. Jordan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050679 |
| v. | (Super. Ct. No. 14CF0231) |
| DONALD JORDAN, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Donald Jordan, Jr., of criminal threats (Pen. Code, § 422, subd. (a) [counts 1-2]; all citations are to the Penal Code unless noted otherwise), attempted false imprisonment by violence (§§ 236, 237, subd. (a), 664, subd. (a) [counts 3-4]), carrying a loaded, stolen firearm in public (§ 25850, subds. (a), (c)(2) [count 5]), felon in possession of a firearm (§ 29800, subd. (a)(1) [count 6]), assault with a firearm (§ 245, subd. (a)(2) [counts 7-8]), and brandishing a deadly weapon (§ 417, subd. (a) [count 9].)  The jury also found Jordan was personally armed (§ 12022, subd. (a)(1); counts 1-4) and personally used (§ 12022.5, subd. (a)(1); counts 1-4) a firearm. Jordan contends there is insufficient evidence he committed criminal threats, attempted false imprisonment, and assault with a firearm.  For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In January 2014, Maria Bravo lived in Santa Ana with her family.  Irma Mendoza rented a room in the same house.  On the evening of January 22, Bravo and Mendoza took a walk around their neighborhood.  As they passed a vacant lot, a man, later identified as Jordan, and his female companion began following them.  Bravo grew frightened and told Mendoza to walk faster.

Bravo and Mendoza returned home, with Jordan and the woman still following.  Mendoza told Bravo they should sit on the porch and wait for the couple to depart.  Jordan and his companion stopped at the driveway.  Jordan's companion assisted him in removing his jacket, and he put his hand on his waist.  Bravo insisted they retreat into the house, and she closed all the windows and doors.

After several minutes, Mendoza said "let's see what they want" and suggested "maybe they just want a dollar or an address."  Mendoza opened the door. Bravo stood two steps from Mendoza behind the door.  According to Mendoza, Jordan

2

stood next to the door with a black handgun in his right hand. His arm was bent, and he pointed the gun to the right side of his leg at a 45-degree angle toward the floor. Jordan commanded, "Get out of the house" or "Get out of the house right now," and moved the weapon laterally. Jordan sounded "nervous," "serious," and "angry," and Mendoza "thought he was going to kill [her]." Mendoza immediately closed the metal screen door, and Bravo closed and locked the wooden main door. Mendoza exclaimed, "He has a big gun." Bravo's legs trembled and she felt "terrorized." She heard footsteps run toward the back of the house and called 911.

Police officers detained Jordan a few houses away in possession of a loaded semiautomatic handgun in his waistband. He had an additional magazine tucked inside his boxer shorts. He was cooperative and "kind of indifferent" and did not appear to be intoxicated. The parties stipulated Jordan was a previously convicted felon, and the gun was stolen.

Jordan testified he was under the influence of crystal methamphetamine at the time of the incident. He was emotional, fearful, and highly anxious. He and his girlfriend left the girlfriend's home to walk to the home of her friend. He denied following Bravo and Mendoza, but admitted they walked behind the women. Jordan borrowed the gun from a friend, did not know if it was stolen, and kept it for protection because of a previous run-in with Hispanic gang members.

Jordan described his encounter with Bravo and Mendoza. He claimed he walked down Bravo's driveway searching for a water hose to get a drink. He took off his jacket because he was hot and sweaty after the walk and because of the drugs. Mendoza appeared through the back door, and when the screen door slammed against the wall, he got "spooked," and he displayed the gun. He fled and hid because he knew he had "induced fear in these people" and he did not want to "end back up in jail." He denied pointing the weapon at Mendoza or telling her to come out of the house.

3

In a pretrial interview, however, Jordan gave a different account of the incident to a police officer. Jordan claimed he went to the rear of the victims' house to retrieve a boxed handgun he had buried in the dirt. He gave the box to his girlfriend and told her to go to the local Burger King. Jordan claimed Bravo and Mendoza had been following him on a regular basis. He decided to trail them to learn why they had followed him, and to ascertain whether they were undercover police officers. He knocked on the door and told them to come out of the house. He displayed the gun, which belonged to his girlfriend, because he wanted to show them the gun.

Following trial in June 2014, a jury convicted Jordan as noted above. Before trial, Jordan admitted suffering a robbery conviction in Nevada in September 2004 that qualified as a serious or violent felony conviction under both the Three Strikes law (§§ 1170.12, subds. (b) & (c)(1), 667, subds. (d) & (e)(1)) and section 667, subdivision (a)(1) (five-year enhancement). He also admitted serving two prior prison terms (§ 667.5, subd. (b)(1)). The court imposed a 10-year, eight-month prison sentence, comprised of a two-year, eight-month term (low term doubled because of the strike conviction) for criminal threats (count 1, a consecutive three-year low term for personal use of a firearm (§ 12022.5, subd. (a)), and a consecutive five-year term for the prior robbery conviction (§ 667, subd. (a). The court imposed concurrent or stayed (§ 654) terms for the other convictions and enhancements.

II

DISCUSSION

Jordan challenges the sufficiency of the evidence to support the convictions for criminal threats, attempted false imprisonment, and assault with a firearm. On appeal, we must view the record in the light most favorable to the judgment below. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) The test is whether substantial evidence supports the verdict (*Jackson v. Virginia* (1979) 443 U.S. 307, 318; *People v. Johnson* (1980)

4

26 Cal.3d 557, 577-578), not whether the appellate panel is persuaded the defendant is guilty beyond a reasonable doubt. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139 (*Crittenden*).) It is the jury's exclusive province to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 (*Sanchez*).) Accordingly, we must presume in support of the judgment the existence of facts reasonably drawn by inference from the evidence. (*Crittenden,* at p. 139; see *People v. Stanley* (1995) 10 Cal.4th 764, 792 [same deferential standard of review applies to circumstantial evidence].) The fact that circumstances can be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.) Consequently, an appellant "bears an enormous burden" in challenging the sufficiency of the evidence. (*Sanchez,* at p. 330.)

A.    *Substantial Evidence Supports the Criminal Threats Convictions*

Jordan asserts his statement "Come out of the house right now" was vague and did not specifically convey an immediate threat of great bodily injury or death, and displaying the gun did not convert the allegedly vague statement into a criminal threat. He also urges his conduct in running away and hiding demonstrates he did not intend to threaten the women. Finally, he argues there was insufficient evidence he threatened Bravo, who remained in the house behind the door. We do not find these arguments persuasive.

Section 422 provides in relevant part, "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the

5

person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (See *People v. Toledo* (2001) 26 Cal.4th 221, 227-228 [restating elements]; CALCRIM No. 1300.)

A threat is assessed by considering "all the surrounding circumstances and not just the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340; see *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137.) "[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422." (*People v. Butler* (2000) 85 Cal.App.4th 745, 753 (*Butler*). "'The use of word "so" [in section 422] indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim." (*People v. Bolin* (1998) 18 Cal.4th 297, 340.)

Here, the jury reasonably could conclude Jordan's serious and angry order to come out of the house, made while menacingly gesturing with a handgun, constituted a verbal threat to commit a crime resulting in death or great bodily injury. The facts in this case are similar to those in *People v. Culbert* (2013) 218 Cal.App.4th 184, 194 (*Culbert*). There, the defendant confronted his stepson H., held an unloaded revolver to the boy's head, and said "[d]on't ever lie to me" and "[d]on't you ever call me that again," before pulling the trigger. (*Id.*, at p. 188.) The appellate court rejected the defendant's contention his statements contained no explicit or implicit threat to inflict death or great bodily injury. "Few objects are as inherently threatening as a firearm, especially when it is pressed to one's head. The only rational inference, taking into account the entire context in which these statements were made, is that appellant was threatening to harm H.

6

if H. ever again lied or called him names.  Appellant did not need to add a phrase like 'or else,' or 'I'm going to kill you,' to make his statements threatening.  The firearm pressed against H.'s temple accomplished that result." (*Id.*, at p. 190; see *Butler, supra,* 85 Cal.App.4th at p. 759 [punishable threats can be nonspecific and ambiguous so long as they reasonably may be construed, under the circumstances, as threatening death or great bodily injury].)

Concerning the conviction related to Bravo, she stood directly behind Mendoza when Jordan uttered his command to come out of the house.  She heard Mendoza exclaim Jordan had a big gun.  Given that Jordan followed both women to the house, the women entered the house together, and they stood near each other just inside the door, the jury reasonably could conclude Jordan threatened both women.

B.    *Substantial Evidence Supports the Attempted False Imprisonment Convictions*

Jordan also argues there was insufficient evidence he attempted to falsely imprison Mendoza and Bravo.  He asserts the women did not testify they were forbidden from going anywhere or that they tried to leave, and they remained free to stay in their home or to leave.  He also asserts there was no evidence he intended to confine the women.

"False imprisonment is the unlawful violation of the personal liberty of another.  (§ 236.)  The crime of false imprisonment requires some intended confinement or restraint of the person; any exercise of force or express or implied threat of force by which in fact the person is restrained from his liberty, compelled to remain where he does not wish to remain, *or to go where he does not wish to go*, is such imprisonment. [Citation.]  The imprisonment may be committed by acts or words said or done with the intent of causing the confinement.  [Citation.] [¶]  An attempt to commit a crime consists of a specific intent to commit the crime, and a direct but ineffectual act done toward its

7

commission. [Citations.]" (*People v. Ross* (1988) 205 Cal.App.3d 1548, 1553-1554, italics added; see *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1360.)

False imprisonment "effected by violence, menace, fraud, or deceit" is punishable as a felony. (§ 237.) The elements of felony false imprisonment are: (1) the defendant intentionally and unlawfully restrained, confined, or detained another person, compelling him to stay or go somewhere; (2) the other person did not consent; and (3) the restraint, confinement, or detention was accomplished by violence or menace. (*People v. Newman* (2015) 238 Cal.App.4th 103, 109-110; *People v. Fernandez* (1994) 26 Cal.App.4th 710, 717; CALCRIM Nos. 1240 [felony false imprisonment] & 460 [attempt].)

In *People v. Riddle* (1987) 189 Cal.App.3d 222, the defendant ordered a young woman's parents out of their home at gunpoint, and then sexually assaulted their daughter inside the home. The appellate court held the defendant falsely imprisoned the parents by forcing them out of their home: "The personal liberty of each of [the girl's] parents was unlawfully restrained when Riddle accomplished their removal from the trailer home under threat of the firearm. Though the restraint was short in time and distance, the restraint was real." (*Id.* at pp. 229-230.)

Here, the jury reasonably could conclude Jordan attempted to falsely imprison Mendoza and Bravo by forcing them to leave their home unwillingly when he threatened them with his gun. His statement and actions reflect the intent that they leave the home. Substantial evidence supports the false imprisonment convictions.

C.    *Substantial Evidence Supports the Convictions for Assault with a Firearm*

Finally, Jordan contends there was insufficient he assaulted Mendoza and Bravo with a firearm because there was no testimony he pointed the loaded weapon at them. He argues he "did not do an act with a firearm that would result in the application of force" against the women, nor was it reasonable under the circumstances to conclude he "should have known . . . pointing the gun to the ground would likely inflict harm . . . ."

8

We disagree because drawing a loaded firearm against a person who is within its range is sufficient to constitute an assault.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Assault with a firearm is a felony. (§ 245, subd. (a)(2).) Assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts sufficient to establish that the act by its nature will probably and directly result in such injury. (*People v. Williams* (2001) 26 Cal.4th 779, 782.)

The trial court instructed the jury that to find Jordan guilty of assault with a firearm, it needed to find beyond a reasonable doubt he did an act with a firearm that by its nature would directly and probably result in the application of force to a person, he did the act willfully, when he acted he was aware of facts that would lead a reasonable person to realize his act by its nature would directly and probably result in the application of force to someone, and he had the present ability to apply force with a firearm to a person. (CALCRIM No. 875) The trial court explained application of force meant "to touch in a harmful or offensive manner" and "[t]he slightest touching can be enough if it is done in a rude or angry way." The court also instructed the prosecution did not need to prove Jordan actually intended to use force against someone when he acted, and no one had to actually have been injured by his act.

In *People v. McMakin* (1857) 8 Cal. 547 (*McMakin*), the defendant threatened to shoot the victim if he did not leave a parcel of property, at the same time drawing a revolver, with the gun pointed such that the bullet would strike the ground before it reached the victim if fired. The court affirmed an assault conviction: "The ability to commit the offense was clear. Holding up a fist in a menacing manner, drawing a sword or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So any other similar act, accompanied by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual

9

violence against the person of another, will be considered an assault." (*Id.* at p. 548; see *Hays v. The People* (N.Y. Sup.Ct. 1841) 1 Hill 351, 353.)  The court noted there need not be a direct attempt at violence, and that where "preparations are actually made, and weapons drawn, and placed in a position to be instantly used offensively, and with effect, against another, and not in self defense, it would seem to be clear that the offense would be complete." (*McMakin*, at p. 548.)[1]  Jordan drew the loaded gun, had the present ability to inflict a violent injury and his act would probably and directly result in such injury.  (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.)

Here, the jury reasonably could conclude Jordan's drawing of a loaded weapon and using it in a threatening manner in an attempt to force Mendoza and Bravo out of their home constituted assaults on both women.  It is immaterial the victims thwarted the infliction of injury by closing the door.

---

[1]     We observe, "[t]he drawing of a weapon is generally evidence of an intention to use it." (*Id.* at p. 549; see *People v. Chance* (2008) 44 Cal.4th 1164, 1172 [it is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault; defendant's act of pointing a gun at a place where he thought the victim would appear established actus reus]; *People v. Escobar* (1992) 11 Cal.App.4th 502, 504-505 [the defendant need not exhibit the weapon, or point or fire the weapon; the defendant held concealed gun in a briefcase and victim standing in front of him heard sound of the gun being cocked]; *People v. Yslas* (1865) 27 Cal. 630, 633-634 [the defendant approached within seven or eight feet of the victim with a raised hatchet, but the victim escaped injury by running to the next room and locking the door; Yslas committed assault, even though he never closed the distance between himself and the victim, or swung the hatchet]; *People v. Hunter* (1925) 71 Cal.App. 315, 318-319 [the victim jumped out a window as the defendant tried to pull a gun from his sock; Hunter committed assault, even though the victim was gone before he could deploy his weapon].)

### III

#### DISPOSITION

The judgment is affirmed.

ARONSON, J.

WE CONCUR:

O'LEARY, P. J.

IKOLA, J.